433 So.2d 110 (1983)
STATE of Louisiana
v.
Curtis R. GERMAIN.
No. 82-KA-0752.
Supreme Court of Louisiana.
May 23, 1983.
Rehearing Denied June 24, 1983.
*112 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Louise Korns, Ronald Loumiet, William "Chuck" Credo, Asst. Dist. Attys., for plaintiff-appellee.
William Noland, Lawrence Boasso, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
Curtis R. Germain was indicted by a Jefferson Parish Grand Jury for second degree murder. (R.S. 14:30.1). He was tried by a twelve person jury on August 25 and 26, 1981 and was convicted of manslaughter. (R.S. 14:31). On November 16, 1981 the trial court sentenced defendant to twentyone years at hard labor, the maximum sentence for manslaughter. Defendant now appeals his conviction and sentence, arguing four of five assignments of error.
On March 17, 1981, at approximately 1:10 a.m., Valerie LaMountain, a three year old girl, was brought to the emergency room of East Jefferson Hospital by defendant and his wife. The child was pronounced dead on arrival. Upon physical examination of the child it was revealed that the child had bruises of all colors over her entire body.[1]
Elizabeth Conners, a registered nurse who works in the emergency room at East Jefferson Hospital, testified that the security guard called her to come to the entrance of the emergency room to help him since a man had come in with a limp child in his arms. When she asked the man what had happened, he responded that the child had been sick all day and that he had kept hitting her to keep her awake.
Gloria LaMountain Germain, defendant's wife and the child's mother, voluntarily waived her privilege under R.S. 15:461[2] and *113 agreed to testify against defendant. Mrs. Germain had been married to defendant for three and one-half months before the death of her child. Defendant was not the father of the child.
Mrs. Germain testified that after defendant lost both his job and a lawsuit, approximately six weeks before the child's death, he began drinking heavily, and became jealous of the attention she paid to her daughter. She further testified that defendant would beat the child; would hit her with a belt to stop her from sucking her thumb; and would get up in the middle of the night and make the child stand in a corner for three or four hours as punishment. Further, Mrs. Germain testified that defendant had threatened to kill all three of them, at least three times, if Mrs. Germain attempted to report his beatings of the child to the authorities.
Two nights before the child's death, defendant had given Valerie some wine in order to make her sleep quietly. Mrs. Germain testified that she saw defendant hit Valerie in the stomach, that Valerie tried to get up, but could not gain her balance and fell back again. When Valerie fell backward she struck her head against the floor. The child got up after hitting her head, and defendant gave her more wine and they put her to bed. The next day the child was having trouble staying awake despite cold baths, walks, and liquids. At approximately 1:00 o'clock the following morning, Valerie stopped breathing, and defendant and Mrs. Germain then took her to the hospital.
The pathologist, Dr. Alvaro Hunt, testified that the child was bruised over her entire body, and that the cause of death was "an acute subdural hemorrhage involving the left portion of the brain."[3] Dr. Hunt further stated that the child had "numerous small contusions or what we call brain bruises on both sides of the brain." When asked how many brain bruises she had, Dr. Hunt responded, "There were too many to count." He explained that the "bruises [were] within the substance of the brain, itself." And, he also pointed out that "she also had many small areas of bruising or hemorrhaging beneath the skin on the outside of the boney skull, as well."
As his defense, defendant tried to establish that it was his wife, rather than defendant, who constantly abused the child. He testified that he was an alcoholic who had stopped drinking for several years, but had resumed drinking again. Even though he admitted hitting the child for disciplinary reasons when he was drunk, he denied beating her. However, he confessed that *114 he did not know what he was doing when he was drunk. In addition, he testified that he never intended to do any serious harm to the child. He contended that Mrs. Germain often hit the child because she resented the little girl for ruining her relationship with the child's father. Defendant stated that he would hit Mrs. Germain when she abused the child. He asserted that he was planning to adopt the child. On cross-examination, defendant maintained that Mrs. Germain caused all of the child's bruises; that his disciplinary spankings were not constant; and that "everytime, I only hit her once." Defendant admitted hitting her on the buttocks the night she fell, and that when he hit her she fell and hit her head hard on the floor.
Argument No. I (Assignment of Error No. II)
Defendant contends that the trial court erred when it denied his motion to suppress oral inculpatory statements which he made to law enforcement officials while at East Jefferson Hospital.
Deputy Schanbien and Lieutenant Foster were dispatched to a possible child abuse case at East Jefferson Hospital. Both officers went to the nurses' supervisor's office to speak to Mr. and Mrs. Germain. Upon their entrance, defendant inquired: "How is the baby?" Lieutenant Foster stated that the child was dead. Defendant, who was holding his wife at the time, stated: "God is my witness, I'm sorry." Foster then informed defendant and his wife that they were under investigation for the death of the child, and verbally advised them of their rights. Both stated that they understood their rights. Immediately afterward, Deputy Schanbien again informed the couple of their rights, individually, using a printed rights form. Defendant signed his form and signed a waiver of his rights.
Defendant and Mrs. Germain were then separated. Deputy Schanbien took Mrs. Germain from the nurses' office to question her and Lieutenant Foster remained with defendant to question him. Foster again informed defendant that he was under investigation and that he would be asking him some questions. Foster testified that although defendant appeared nervous and upset, he was not intoxicated and he was coherent.
A question and answer interrogation between Lieutenant Foster and defendant took place from approximately 1:37 a.m. until 1:51 a.m., when defendant stated: "Before I say any more, I want an attorney." The interrogation ceased and Lieutenant Foster left the office. Defendant was not afforded an attorney at that time. At approximately 2:02 a.m., Lieutenant Foster returned to the nurses' office, where defendant was waiting, to complete paper work and watch the suspect.
Lieutenant Foster testified that when he returned to the room defendant stated: "I was in the hospital for three weeks and I told them I needed help, but they laughed at me." Lieutenant Foster testified that he then told Germain that he did not have to say anything further, at which time defendant asked: "I want to know if I caused this; is this because of me?" Lieutenant Foster then asked defendant how the cuts got on the child's neck. Defendant responded: "What cuts?" Lieutenant Foster inquired about the bruises on her face and defendant stated: "She would fall a lot when I would hit her; I thought she was spoiled so I hit her.... I had been drinking a lot, I would rather have an attorney; I'm afraid of what I did." At this point Lieutenant Foster terminated the interrogation. Lieutenant Foster specifically stated that Germain initiated the conversation when Lieutenant Foster returned to the office.
Defendant testified that he initially requested an attorney when he signed the "rights of arrestee" form. He suspected that the officers did not hear him, and he again requested an attorney sometime after the interrogation had begun. Defendant testified that Lieutenant Foster, not defendant, initiated the conversation when he returned to the office, and that Lieutenant Foster did not again inform defendant of his rights. After awhile, defendant again requested an attorney. Defendant stated that the questioning continued for a short *115 time after this final request, and was then terminated.
Defendant testified at trial that when he signed the form he did not fully comprehend what he was signing because he was very emotionally disturbed by the child's death.
Both officers disputed defendant's testimony that he requested an attorney when he signed the rights form.
Defendant asserts that the use of the inculpatory statements obtained during the custodial interrogation, following the request for counsel, violated his United States constitutional rights under the Fifth, Sixth and Fourteenth Amendments. Defendant argues that, regardless of who initiated the conversation after the request for counsel, Lieutenant Foster seized the opportunity to ask direct questions which he knew were "reasonably likely to evoke an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Counsel for the defense maintains that the interrogation and the subversion of Germain's right to counsel invalidates the voluntariness of his statements.
When the prosecution wishes to use statements stemming from a custodial interrogation of the defendant, it must first be established that the accused was informed of his Miranda rights and that the statements were made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. West, 408 So.2d 1114, 1116 (La.1982); State v. Thucos, 390 So.2d 1281, 1284 (La.1980). If the accused indicates in any manner and at any stage that he desires the presence of an attorney, the interrogation must cease until counsel is present. Miranda v. Arizona, supra 384 U.S. at 474, 86 S.Ct. at 1627-28; State v. Carter, 412 So.2d 540, 546 (La.1982).
Recently, the United States Supreme Court in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), confronted the question of waiver of the right to the presence of counsel, once requested, during the continued interrogation. In that case, the Court stated:
"... although we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, see North Carolina v Butler, supra 441 U.S. [369] at 372-376, 99 S.Ct. [1755] at 1757-1759 [60 L.Ed.2d 286], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards v. Arizona, supra 451 U.S. at 484-85, 101 S.Ct. at 1884-85.
Defendant was twice advised of his Miranda rights. Both times he indicated that he understood what those rights were and that he understood the consequences of a waiver of those rights. Further, defendant signed the waiver of rights provision in the form provided him, waiving his Miranda rights.
However, when defendant expressed his desire for the presence of an attorney for any further interrogation, the interrogation should not have continued until counsel was present, unless defendant waived his United States constitutional right to counsel under the Fifth and Fourteenth Amendments. When defendant, Germain, requested counsel, Lieutenant Foster terminated the interrogation and left the office. When Lieutenant Foster returned to the nurses' office, defendant initiated conversation with the officer. *116 Lieutenant Foster interrupted defendant and reminded him that he did not have to talk. Despite this advice, defendant continued to talk to the officer. Only after defendant had initiated conversation with Lieutenant Foster, did the officer begin to ask defendant questions.
Lieutenant Foster only asked a probing question after assuring himself that defendant understood that he was not required to speak. There is no evidence of any mental or physical coercion. The questioning or the reinterrogation began only after defendant's initiation of the conversation. Therefore, Lieutenant Foster did not initiate further questioning after a request for an attorney.
Under all the circumstances, it is reasonable to conclude that defendant waived his Miranda right to the presence of counsel.
The trial court's conclusion as to the admissibility of the statements after the request for counsel was correct.
This assignment of error lacks merit.
Argument No. II (Assignment of Error No. III)
Defendant argues that the trial court erred in allowing the state to introduce prior acts of misconduct of the defendant which were not within the scope of the Prieur notice provided to defendant.
The state, under State v. Prieur, 277 So.2d 126 (La.1973), informed defendant, on August 20, 1981, that it intended to use and introduce evidence of other acts under the evidentiary exceptions outlined in R.S. 15:445 and 15:446. The notice reads:
"1. For approximately two weeks prior to the death of Valerie LaMountain, birthdate 8/27/77, the defendant did abuse said child by repeatedly beating and whipping her on various occasions the exact date and time of which the State is not cognizant.
2. The use of the evidence of these other crimes are not merely repetitive and cumulative, are not a subtrefuge (sic) for depicting the defendant's bad character or propensity for bad behavior, and that it serves the actual purpose for which it is offered."
On August 13, 1981 the state informed the court, when it was considering various defense motions, that it intended to file a Prieur notice, but that there were problems because the information which the state had obtained from Mrs. Germain was not specific. Therefore, the state informed the court and counsel for the defense that it did not have enough information from their witness to incorporate specifics into the Prieur notice, and the state moved for a Prieur hearing.
The Prieur hearing was conducted after the selection of the jury, outside the presence of the jury, on August 25, 1981. During this hearing the state informed the court that it believed the relevant time frame for the incidents of abuse was actually from the time defendant lost his job and his lawsuit: six weeks before the child's death. The state argued that it was not possible to separate the abuses to the child and to present only the abuses within the two week time limitation set out in its Prieur notice. The state contended that in order to show defendant's intent and motive, it would be clearer if the Prieur notice could be amended to encompass the six weeks before the death of the child and to include the abusive acts and threats by defendant toward Mrs. Germain.
Defense counsel argued that the state had not complied with the notice requirements of Prieur, and that the state should not be permitted now to go back in time and present other beatings and acts which it considered relevant.
At this Prieur hearing, Mrs. Germain testified about the abuses committed by defendant upon Valerie within the six week period before the child's death. The only specific events which she could recall were those which happened within the two week period preceding the child's death. However, she pointed out that defendant had stopped drinking and did not beat the child the second week before her death. It appears that the child did not receive any abuse the second week prior to her death *117 because defendant wanted to take her to the doctor to examine a lump in her stomach. He stopped the drinking and the abuse to permit her other bruises to heal so no one would notice them. The drinking and abuse subsided for that entire week, but the child was never taken to a doctor, and the abuse resumed the week before her death. Mrs. Germain testified that defendant began drinking again at this time.
The trial court expanded the time period covered in the Prieur notice and covered at trial beyond the two week period on the basis that the relationship within the family was one continuous activity which was relevant to the case. The trial court noted that it would be difficult to sever the instances and found that defendant would not be prejudiced since the events that would be testified to took place when only the three family members were present. The trial court could find no reason why defendant should be afforded a "magic cutoff." Upon completion of the Prieur hearing the trial court found that the evidence of other acts and offenses against both Valerie and Mrs. Germain would be admissible to show defendant's motive.
Defense counsel objected to the court's expansion of the scope of the Prieur notice and to the court's ruling as to admissibility on the record.
The state, within a reasonable time before trial, must furnish in writing to the defendant a particularized statement of the other acts or offenses it intends to offer, specifying the exception to the general exclusionary rule upon which it intends to rely for their admissibility. State v. Goza, 408 So.2d 1349 (La.1982); State v. Prieur, supra at 130. The only exception to this notice requirement relates to evidence of offenses which are part of the res gestae, or are used to impeach defendant's testimony. State v. Goza, supra at 1352; State v. Prieur, supra at 130.
The defendant must have notice of the nature and the cause of the accusation in order to prepare his defense and to exercise fully his confrontation and cross-examination rights. See La. Const., art. I, §§ 13 and 16; State v. Prieur, supra at 130.
In this case, the state informed defendant that it intended to offer evidence of other acts of abuse committed by defendant upon Valerie within the two week period preceding her death. The state also apprised the court, seven days prior to providing the Prieur notice, that it was experiencing difficulty in accurately establishing the time of the abuses. However, the state filed its notice despite these peculiar problems. From Mrs. Germain's testimony it became clear that she was unable to identify the specific times many of the beatings occurred.
The record reveals that the state provided defendant with its entire file, including all statements which it had, and made an effort to constantly notify defendant and the trial court of its problems, and the reasons for its problems with the Prieur notice.
It cannot be said that defendant was surprised when Mrs. Germain testified about the abuses committed upon Valerie prior to the two weeks preceding her death and the abuses and threats by defendant to Mrs. Germain. Her statements made during the investigation were included in the file made available to the defense by the prosecution. The object and purpose of the "Prieur" notice and hearing have been satisfied. See State v. Prieur, supra.
Generally, evidence of other acts of misconduct is not admissible; however, there are statutory and jurisprudential exceptions to this exclusionary rule, when the evidence of other acts tends to prove a material issue and has independent relevance other than showing that the defendant is a man of bad character. State v. Moore, 278 So.2d 781, 785-87 (La.1972) (On Rehearing 1973); State v. Prieur, supra; R.S. 15:481. Even if independently relevant, the probative value of such evidence must be weighed against its prejudicial effect. State v. Moore, supra at 787-88.
R.S. 15:445 and 446 provide:
"In order to show intent, evidence is admissible of similar acts, independent of *118 the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." R.S. 15:445.
"When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged." R.S. 15:446.
Evidence of other similar acts or offenses, preceding or subsequent to the charge in question, may be relevant to show the presence of intent when there is a real and contested issue of intent at trial. R.S. 15:445 and 446; State v. Moore, supra; State v. Prieur, supra at 129.
In the case before us, specific intent was a real and genuine issue at trial. Defendant was charged with specific intent second degree murder which is defined in R.S. 14:30.1 as "... the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm." Defendant asserted as his defense that he hit the child to discipline her, but that he never intended to harm her. By this assertion of innocence, or lack of intent, defendant directly put the question of his having the requisite criminal intent for the commission of the crime at issue.
The many instances of defendant's abuse of the child, and threats and abuse of the mother, make his explanation less convincing. The evidence of these prior acts had great probative value. State v. Monroe, 364 So.2d 570 (La.1978).
Defendant also blamed his wife for the abuse of the child. This defense was not strongly advocated, but it was a real issue in the case. The evidence of defendant's prior abuse of the child is also highly relevant to show the identity of the offender.
The probative value of the evidence of other offenses must also be balanced against its "prejudicial nature" to determine its admissibility. There is hardly any evidence more "prejudicial" than evidence of child abuse, in the usual meaning of the word. Further, any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. "Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.
In a child abuse case, when accidental injury and identity of the offender are made the issues in the case, it is not unduly and unfairly prejudicial to expose to the fact finder earlier incidents between the defendant and the victim which tend to prove beyond a reasonable doubt that the injuries charged against the defendant were committed intentionally and by the defendant himself. In this sense it can be said that the probative value of the evidence of earlier abuse outweighs its prejudicial nature.
The assignment is without merit.
Argument No. III (Assignment of Error No. IV)
Defendant contends that the trial court erred in allowing the state to introduce certain prejudicial photographs at trial. He argues that the seven color photographs of the child's body are gruesome, and that other photographs (of the mother's bruises and of defendant's gun) lacked any probative value and were highly prejudicial.
The ruling of a trial court with respect to the admissibility of allegedly gruesome photographs will be disturbed only if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Tonubbee, 420 So.2d 126, 133 (La.1982); State v. Landry, 388 So.2d 699, 703 (La.1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981).
At trial the nurse, Mrs. Conners, identified the seven color photographs of the child's body as accurately depicting the bruises and marks covering her entire body. *119 The trial court, over defense counsel's objections, allowed the photographs as corroborative evidence of the nurse's testimony which indicated the condition of the victim at the time she was brought to the emergency room.
The seven photographs at issue show the bruises and marks blemishing the body of Valerie LaMountain. They depict in close-up the different colors of the bruises on different portions of her body, and include a photograph of her entire body. These photographs were taken in an examination room. Although they are unpleasant, it cannot be said that they are so gruesome as to overwhelm the reason of the jurors, and to cause a jury to lose sight of the need for the state to establish with sufficient independent evidence the guilt of the accused.
Counsel for defendant also challenges the introduction of a photograph of a shotgun and photographs of bruises on defendant's wife. Defendant contends that these photographs had no probative value, and were solely introduced in an attempt to show that defendant had a violent nature.
The photographs showing bruises on defendant's wife are relevant in that they corroborate Mrs. Germain's version of the cause of the abuse received by Valerie, and they rebut defendant's testimony that Mrs. Germain, not defendant, beat the child. The photograph of the shotgun in the closet was simply demonstrative evidence supporting Mrs. Germain's testimony that defendant had threatened to kill his wife and stepdaughter.
This assignment of error lacks merit.
Argument No. IV (Assignment of Error No. V)
Defendant contends that the trial court erred in imposing an excessive sentence of twenty-one years at hard labor without a consideration of the sentencing guidelines provided in C.Cr.P. 894.1.
At sentencing, defense counsel pointed out to the court that several witnesses were present to vouch for defendant's credibility. The court stipulated to the fact that if these people were to testify, they would testify that defendant had a good character. Counsel also stated that defendant did not have a serious previous record.
In sentencing this defendant, the trial court stated:
"All right, the record will reflect that the Pre-Sentence Investigation relative to this matter has been given verbally to Mr. Higgins along with myself in Chambers by Mr. Willard Tucker from Probation.
This report reflects the data that would be in the final typed report. Absent from that report is the statements from the family and friends alluded to by Mr. Higgins that would be favorable to the defendant.
The Court accepts the statement of Mr. Higgins that these reports would be favorable to the defendant. I have reviewed that data along with my notes on the trial of this case.
Mr. Germain was convicted by a jury of the crime of manslaughter  involved in this case was a small child.
The Court is convinced from the testimony that the act resulting in the death of the child was not one isolated incident of abuse but that a pattern of abuse was established throughout the trial.
The Court is convinced that Mr. Germain prior to that act that resulted in the death of the child had abused the childthis child, a beautiful small child in the prime of her adolescence.
The Court knows of no reason why any sympathy should be shown to Mr. Germain.
Accordingly, the Court gives the maximum sentence to Mr. Germain. You are ordered to serve a period of twenty-one (21) years at hard labor and you are, at this time, remanded to the custodial authorities with the Department of Corrections."
From the circumstances surrounding the child's death, it is evident that a lesser sentence would deprecate the seriousness of the offense. Therefore, the trial court did *120 not abuse its discretion in sentencing defendant to the maximum.
This assignment of error lacks merit.
For these reasons, the conviction and sentence of defendant are affirmed.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
Although I fully subscribe to the majority opinion, I add these additional concurring thoughts.
In this case, as in our earlier decision in State v. Humphrey, 412 So.2d 507 (La.1982), this court recognized the special relevancy of prior acts of physical abuse against a child victim (1) when the accused is one of only a few persons with a special relationship with the child victim (and hence, a special proximity and access to the child), and (2) when the circumstances indicate a great likelihood that the abuser was one of that special group, rather than a stranger. Under such circumstances, the showing of a history of child abuse assumes special significance in aiding the jury to determine who (among the several "suspects") committed the crime. Further, when the child (again such as here and in Humphrey) is unable to recount the story of its ordeal and, hence, to identify his attacker (because of his death or his being too young to tell the story), there is obviously a special necessity for such evidence, since other modes of proof may be lacking.
I concur only to point out that we have created no special evidentiary rule or "pigeonhole of admissibility" for other crimes evidence which shows prior instances of violence by the defendant towards the physically abused victim in a case involving child abuse. Rather, the trial judge in each case must undertake the difficult task of weighing carefully the probative value of such evidence by its tendency to "identify" the assailant against its tendency merely to reveal the "bad character" of the accused.
Hence, in this case, for the well-stated reasons in the majority opinion, this court determined that the trial court did not abuse its discretion in finding that the probative value of the evidence outweighed its prejudicial effects.
NOTES
[1] Nurse Conners described the bruises as follows:

"There were bruises on the baby's chin; on its foreheadall the way across the baby's forehead; on the right cheek, there was a very large bruise; there was a bruise around both eyes, there were abrasions and bruises noted to the neck. There were bruises on the left area over the collar bone; there were bruises on the left armthey were round and large; there were multiple colored bruisesthere were yellow bruises, green bruises, purple bruises. There were bruises on the lower-arm on both sides. On the right arm, there were smaller bruises than on the left side. On the torso, on the body of the child, there were multiple small bruises especially on the chest and the abdomen. On the left side of the abdomen, there were lines and bruises and discolorations. On the buttocks there were, on the right buttocks, there were 22 linear bruisesthey were discolored, they were purple. On the left-side, there were four-dark purple bruises and five-linear bruises and discolorations. On the back of the legs, there were linear bruises. On both knees, there were bruises in the size of dimes and they were various colors and various shapes. On the right ankle and the left ankle, there were bruises, they were abrasions as well as bruises. That's down to her feet."
[2] R.S. 15:461 provides:

"The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but:
(1) Private conversations between husband and wife shall be privileged.
(2) Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other.
(3) In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes or offenses, a person so charged shall, at his own request, but not otherwise, be deemed a competent witness."
[3] Dr. Hunt, who examined the child's body for the cause of death, testified that the subdural hematoma was located in the parietal occipital area of the brain. He testified that a child could not receive that type of injury from an ordinary fall, since it would require a blow of significant force. Dr. Hunt explained how the blow to the child's head caused her death:

"Well, an injury to the brain, itself, is characteristically accompanied by swelling of the brainjust as a bruise or a blow to the arm, there is swelling in the area that received the blow. As a result of swelling of the brain, the brain lies within a sharply confined boney cavity and the only opening in the brain is a large circular opening at the base of the skull through which the spinal cord passes. As a result of swelling of the brain, the brain is pushed downward in to the region of that opening and the base of the brain or the area called Medulla is pushed downward in to the opening. That area, the Medulla, contains both the cardiac center and the respiratory center which control both cardiac heart rhythm and respiratory rhythm. As a result of the area being pushed into that hole these areas become disorganized and an irregular heart rate at an irregular respiratory rate occurs until cardiorespiratory arrest occurs and the patient dies.
. . . . . .
It was my opinion that this hemorrhage or hematoma was of no more than 24 hours duration."