440 So.2d 230 (1983)
STATE of Louisiana, Appellee,
v.
Joseph DAIGLE, Appellant.
No. CR82-819.
Court of Appeal of Louisiana, Third Circuit.
October 12, 1983.
Rehearing Denied November 28, 1983.
Writ Denied January 16, 1984.
*232 Jack Miller, Don Landry and Michael Harson, Asst. Dist. Attys., Crowley, for appellee.
Gerald J. Block, Showers & Guidry, Lafayette (Michael Skinner, Lafayette, of counsel), for appellant.
Before DOMENGEAUX, FORET and YELVERTON, JJ.
FORET, Judge.
Joseph Daigle (defendant) was indicted by the Lafayette Parish Grand Jury for the second degree murder of Lucille Castille, in violation of LSA-R.S. 14:30.1. Defendant entered a plea of not guilty to the charge. Subsequently, he was tried by a jury and found guilty as charged. The trial court then imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
Defendant appeals from his conviction and makes the following assignments of error:
(1) The trial court erred in denying defendant's motion for a change of venue, thereby depriving him of his right to a fair and impartial trial.
(2) The trial court erred in allowing the State, over defendant's objection, to introduce evidence of prior criminal acts committed by defendant, when the probative value of such evidence was greatly outweighed by its prejudicial effect on the jury.
(3) The trial court erred in allowing in evidence certain photographs of the victim, which were of such a gruesome nature as to unduly prejudice the jury against defendant.
(4) The trial court erred in denying defendant's motion for a new trial, as the jury's verdict was contrary to the law and evidence.
(5) The trial court erred in denying defendant's motion for a post-verdict judgment of acquittal, as the State failed to prove every essential element of the crime charged beyond a reasonable doubt.
(6) The trial court erred in refusing to modify defendant's conviction from second degree murder to manslaughter.
(7) The trial court erred in denying defendant's motion to suppress a statement made by defendant to law enforcement officers, as that statement was unconstitutionally obtained.
(8) The trial court erred in refusing to give defendant's requested special instruction number 3 to the jury, as this instruction would have better enabled the jury to understand the responsive verdict of guilty of manslaughter.
(9) The trial court erred in refusing to allow defendant to introduce in evidence the autopsy report prepared by the pathologist who conducted the autopsy on the victim.

FACTS
On the morning of October 19, 1981, a maintenance crew discovered a badly decomposed body stuffed in a garbage barrel that was partially submerged in a small pond located in a park in Lafayette. Later that day, the body was identified as being that of Lucille Castille (age 23). The decomposition of the body necessarily hindered the autopsy performed to determine the cause of death. However, the autopsy did indicate that the victim had not drowned, nor had she died from a drug overdose (although her blood-alcohol level was found to be .216).
On the same day on which the body was found, defendant was arrested by officers of the Lafayette City Police Department. He had been living with the victim for approximately six years. The next day, defendant gave police a taped statement in which he admitted that he had beaten the victim three times during the early morning *233 hours of October 15, 1981. Alerted by a friend of the victim (who had witnessed the first two beatings), the Lafayette City Police Department sent two officers to the residence where defendant and the victim were living. Initially, they were unable to enter the residence, but were subsequently allowed in by defendant. The officers saw the victim lying on a bed in what appeared to be a drunken stupor. However, they did clearly detect that she was breathing regularly and also observed that she had some swelling above her left eye. Apparently, defendant had just beaten the victim for the third time as he was perspiring heavily when he answered the door. After this, the victim was never seen alive again.[1]

ASSIGNMENT OF ERROR NUMBER 1
Defendant contends that he was denied the right to a fair and impartial trial because of extensive pre-trial publicity regarding the crime with which he was charged. He argues that the trial court erred in denying his motion for a change of venue based on this ground.
LSA-C.Cr.P. Article 622 provides:
"Art. 622. Grounds for change of venue
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
Under this article, the defendant must prove more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. The burden of proof is on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Watson, 423 So.2d 1130 (La.1982); State v. Vaccaro, 411 So.2d 415 (La.1982). Whether defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. State v. Vaccaro, supra; State v. Adams, 394 So.2d 1204 (La.1981).
The trial court gave the following reasons for denying defendant's motion for a change of venue:
"The Defendant's Motion For Change of Venue was heard in open Court on April 8, 1982.
After considering the evidence presented, the Court denies the Motion For Change of Venue. The Court does not find the pre-trial publicity to be so extensive as to unduly influence the public or to instill prejudice in the mind of the public. The publicity surrounding the apparent homicide can be divided into three segments. The stories of October 19 and October 20, 1981, related that a body had been found and later identified. The stories of October 20 and 21, 1981 related that a suspect had been arrested. The stories of November 11 and 12 related that the grand jury had handed down its indictment against the defendant. There were no further new stories covering the events, and this was approximately five months ago. The Court is of the impression that, because this story was not one of public notoriety, the defendant can obtain a fair and impartial trial in this Parish."
We have reviewed the record of the hearing held on defendant's motion for a change of venue, and agree with the ruling of the trial court thereon. We note that the trial court's ruling was made on April 12, 1982, and that defendant's trial began *234 on October 11, 1982. Thus, approximately one year had elapsed between the date of publication of the last news stories regarding this case and the date of defendant's trial.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER 2
Defendant contends that the trial court erred in allowing the State to introduce evidence of another crime committed by him. He argues that said evidence was irrelevant, and was introduced for the sole purpose of prejudicing the jury against him.
A review of the record shows that the State furnished defendant with written notice of its intent to introduce evidence of other crimes committed by him as required by State v. Prieur, 277 So.2d 126 (La.1973). The notice states that the evidence of these other crimes would be offered to show defendant's intent, and to prove the continuity of the offense, under the authority of LSA-R.S. 15:445 and 446.
The other crimes evidence of which defendant complains consists of photographs taken of the victim on August 16, 1981, and the testimony of the victim's sister and Lafayette City Police Officer C.J. Dartez. The photographs and testimony indicate that defendant severely beat the victim on that date. Generally, evidence of other acts of misconduct is not admissible; however, there are statutory and jurisprudential exceptions to this exclusionary rule, when the evidence of other acts tends to prove a material issue and has independent relevance other than showing that the defendant is a man of bad character. LSA-R.S. 15:481; State v. Germain, 433 So.2d 110 (La.1983); State v. Prieur, supra. Even if independently relevant, the probative value of such evidence must be weighed against its prejudicial effect. State v. Germain, supra.
LSA-R.S. 15:445 provides:
"§ 445. Inference of intent; evidence of acts similar to that charged
In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction."
LSA-R.S. 15:446 provides:
"`§ 446. Evidence where knowledge or intent is material and where offense is one of a system
When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged."
Evidence of other similar acts or offenses, preceding or subsequent to the charge in question, may be relevant to show the presence of intent when there is a real and contested issue of intent at trial. LSA-R.S. 15:445 and 446; State v. Germain, supra; State v. Prieur, supra.
In the case sub judice, specific intent was a real and genuine issue at trial. Defendant was charged with second degree murder which is defined in LSA-R.S. 14:30.1 as "... the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm". Defendant asserted as his defense that he hit the victim in an attempt to stop her from drinking and neglecting their children, but that he never intended to kill her or to inflict great bodily harm on her. By this assertion of innocence, or lack of intent, defendant directly put the question at issue of his having the requisite criminal intent for the commission of the crime.
In attempting to determine defendant's intent, the jury had only his testimony, a less than conclusive autopsy report, and the testimony of two individuals that defendant had stated that he might kill the victim. Thus, the evidence of the beating that took place on August 16, 1981, approximately *235 two months before the victim's death, had great probative value. This evidence tended to show the severity of the beatings administered the victim by defendant, and provided the jury with highly relevant evidence regarding defendant's intent when he beat her.
However, the probative value of the evidence of other offenses must also be balanced against its "prejudicial nature" to determine its admissibility. "Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. State v. Germain, supra.
In a case in which a defendant is charged with second degree murder, when the intent of the offender is an issue in the case, it is not unduly and unfairly prejudicial to expose to the fact-finder earlier incidents between the defendant and the victim which tend to prove that the murder charged against the defendant was committed with the required specific intent to kill or inflict great bodily harm. In this sense, it can be said that the probative value of the evidence of the earlier beating outweighed its prejudicial nature. Thus, the trial court properly allowed the State to introduce evidence of defendant's earlier beating of the victim.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER 3
Defendant contends that the trial court erred in allowing the State to introduce in evidence certain photographs of the victim's body. He argues that these photographs were not relevant to any issues in the case, and were so gruesome as to unduly inflame and prejudice the jury against him.
Generally, photographs of the body of the victim depicting the fatal wounds are relevant to prove the corpus delicti; to corroborate other evidence of the manner in which the death occurred; to establish the location, severity, and number of wounds; and, to establish the identity of the victim. The test of admissibility is whether the probative value of the photographs outweighs the prejudice that may result from the display to the jury. State v. Michel, 422 So.2d 1115 (La.1982); State v. Lewis, 353 So.2d 703 (La.1977); State v. Cooper, 334 So.2d 211 (La.1976).
After examining the photographs in question (only the hands and feet of the victim were visible), we conclude that they were not especially gruesome. Moreover, the photographs were properly identified as depicting the scene of the crime by the investigating officers who had taken the pictures. Finally, the photographs were relevant to identify the victim (by means of distinguishing tatoos on the hands), and to establish the location of the crime. Since the probative value of the photographs outweighed any possible prejudicial effect, the trial court committed no error in admitting them in evidence.
There is no merit to this assignment of error.

ASSIGNMENTS OF ERROR NUMBERS 4, 5 & 6[2]
By these assignments of error, defendant contends that the State failed to prove every essential element of the crime for which he was convicted beyond a reasonable doubt. Specifically, defendant contends that the State failed to prove that he had the required specific intent to kill or inflict great bodily harm on the victim. Thus, he argues that his conviction should be reversed. In the alternative, defendant contends that this Court should modify the jury's verdict and render a judgment of conviction of the lesser included offense of manslaughter. See LSA-C.Cr.P. Article 821.
LSA-R.S. 14:30.1 provides, in pertinent part:
"§ 30.1. Second degree murder

*236 Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or"
Thus, defendant is correct in noting that an essential element of the crime of second degree murder is that the offender must have "... a specific intent to kill or to inflict great bodily harm; ..."[3].
LSA-R.S. 14:10 provides, in pertinent part, that:
"§ 10. Criminal intent
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
However, specific intent is a state of mind, and need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982), and authorities cited therein.
As noted above, evidence was introduced to show that on August 16, 1981, defendant beat the victim to such an extent that she required medical attention. The photographs of the victim show that she was subjected to a savage and brutal beating on that date. In his recorded statement given to the police officers, defendant admitted that he had beat the victim in the past. Further, defendant testified that he beat the victim three times within a period of approximately an hour to an hour and a-half on the night she died. It must be remembered that, at this time, the victim was very intoxicated and was probably unable to defend herself in any manner.
James Prejean testified that the victim had gone to a store with him to purchase various items on the night she was killed. He stated that defendant was waiting at the victim's father's house when they returned. Defendant became angry upon seeing them, and demanded that the victim tell him where she had obtained money to purchase the items she had bought. When the victim failed to reply, defendant began beating her with his fists with such force that he knocked her against an automobile. Prejean testified that the defendant struck the victim more than once or twice, and that the blows were aimed at her head. Defendant then threatened to beat Prejean if he did not leave, and Prejean left and went to his house.
A short while later, defendant and the victim appeared at Prejean's house, and defendant demanded to know where Prejean had been with the victim. Prejean stated that he had repeated what he had told defendant earlier, i.e., that he and the victim had gone to a store. Defendant then began to beat the victim again. Prejean testified that defendant struck the victim quite a few times, and described the severity of the beating as being "... very harshly". Prejean was the person who called the police that night and directed them to the victim's residence.
Dale Patton, a Lafayette City Police Officer, testified that he was one of the officers dispatched to the victim's residence. When they arrived there, they knocked on the door for approximately five minutes but got no response. Finally, defendant came to the door and was "... sweating profusely...". He was reluctant to allow the officers to enter, but finally did so. Officer Patton stated that the victim was laying on a bed, partially covered. He did not notice any bruises on the victim's neck. The other officer attempted to awaken the victim by shaking her, but was unable to do so. Officer Patton noted that there was "... an extremely heavy odor of alcohol". However, the victim was breathing regularly, and the officers left.
*237 Dr. James A. Freeman was accepted by the trial court as an expert in the field of forensic pathology. He performed the autopsy on the victim. Under the circumstances, Dr. Freeman felt that dissection of the body was necessary and he proceeded to do this. He testified that:
"In starting the dissection and in raisingin doing so, you raise portions of the skin to view the muscles and the tissues underneath the chest walls, and we discovered hemorrhages, or bleedingwe call them ecchymoses; you call them hemorrhages or blood blistersin the area of the right neck and in the area of the two (2) strap muscles of the neck, or the (2) main muscles that run from the back of the ear near the head down to the front part of the chest or breast bone, we call the sternomastoid muscles."
Dr. Freeman then went on to state that the manner in which the victim's body had been stuffed into the garbage barrel could account for the hemorrhages on the right side of the victim's neck. However, it could not account for the hemorrhages found in the strap muscles. Dr. Freeman testified that the most common cause of injuries of this type is "... some type of ligature around the neck or strangulation". He further testified that:
"We could not, with a hundred percent (100%) fact, determine the exact cause of death in this particular patient because the body was so macerated. We assumed because of the marks on the neck that these were consistent with strangulation. And, of course, we have to assume that the manner of death is homicide. You don't strangle yourself.
Q Was that assumption and opinion rendered with reasonable medical certainty?
A Yes, it is."
Dr. Freeman then stated that, at the time he gave his opinion as to the cause of the victim's death, he did not know that she had been beaten by anyone.
Under cross-examination, Dr. Freeman testified that he did not open the victim's skull and examine the brain. He explained that the skull was not fractured, and thus, it was not deemed relevant or necessary to do that in this particular case. Under re-direct examination, Dr. Freeman again stated that, based on his knowledge and experience as a forensic pathologist, the probable cause of the victim's death was traumatic contusions or strangulation. When he was talking about traumatic contusions, he explained that he meant, "... some blunt force applied to the right side of the neck and the area of muscles on either side of the neck, ...". He stated that such injuries could produce results identical to strangulation.
Mrs. Sandra Castille Burney, the victim's sister, testified that she saw the victim after the August 16 beating. She stated that she talked to defendant a few days after this beating had occurred, and asked him to stop. According to Mrs. Burney, defendant replied that the "... next time he wasn't going to beat her; he was going to kill her".
Clifton Mouton testified that he spoke with defendant on the evening of October 15, 1981. He stated that defendant told him that, "... whenever he found Lucille that he was going to beat her up and everything and perhaps maybe kill her". Defendant also told him that: "He had a mind to drive himself and Lucille off the bridge." These statements were apparently made by the defendant after the victim's death.
Sergeant C.J. Dartez testified that he spoke with defendant after the August 16 beating. After advising defendant of his "Miranda" rights, he began to question defendant about this incident. Defendant admitted that he had beaten the victim, and that he had done so with his hands and a black jack. He also admitted that he had bitten the victim.
Defendant denied that he had beaten the victim with his fists, or a black jack at any time. He also denied having told anyone that he would kill the victim. He stated that, after he beat her for the last time on the night of her death, he went to bed. He further stated that both he and the victim got up the next morning around 8:00 o'clock *238 a.m. The two started talking and decided it was time to end their relationship. Dalton Williams, one of defendant's friends, came by the house around this time and defendant invited him in. They stayed inside for about five minutes and then went outside on the porch, where they spoke for approximately forty-five minutes. See footnote 1.
Defendant stated that he then re-entered the house and spoke to the victim. However, she failed to answer. Because he got no response, defendant walked to where the victim was sitting and shook her. Being unable to get her to regain consciousness, he felt for her heartbeat, but there was none, and he was unable to detect any signs of breathing. Defendant testified that he then panicked, locked the doors to the house, and began riding around the city, trying to figure out what to do. It wasn't until late that evening that he decided to dispose of the victim's body in the manner noted at the beginning of this opinion. Defendant denied that he intended to kill the victim, or inflict great bodily harm on her.
Specific intent is an ultimate legal conclusion to be resolved by the fact-finders. State v. Graham, supra; State v. Lecompte, 371 So.2d 239 (La.1978). The defendant was tried by a twelve-member jury of his peers. The jury returned a unanimous verdict of guilty as charged. Since the jury is the ultimate trier of fact, they necessarily reached a conclusion that specific intent was present, along with all of the other elements of the crime of second degree murder. We find that this conclusion is within the jury's discretion.
After thoroughly reviewing the record, we are convinced that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant had the specific intent to inflict great bodily harm on the victim (the essential element of the crime at issue). See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
There is no merit to these assignments of error.

ASSIGNMENT OF ERROR NUMBER 7
Defendant contends that the trial court erred in denying his motion to suppress the tape recorded statement he made to the police on October 20, 1981. He argues that the statement was unconstitutionally obtained, was not made voluntarily, and was made under the influence of fear, duress, intimidation, menaces, threats, inducements and promises. We find no merit to defendant's argument.
In his testimony, defendant admitted that he freely and voluntarily gave the statement to the police officers. Further, the State introduced in evidence two separate waiver of rights forms signed by defendant. One is dated October 19, 1981, and the other is dated October 20, 1981. Both the forms contain the following statement:

"WAIVER OF RIGHTS
I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."
Defendant also argues that the statement should have been suppressed because he could not afford to retain an attorney at the time it was given. Again, we find no merit to defendant's argument. Both "waiver of rights" forms contain information to the effect that: "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." Defendant indicated that he had completed the tenth grade in high school. Certainly, he understood the meaning of the above mentioned information and, yet, chose to go ahead and give a statement to the police officers.
There is no merit to this assignment of error.

*239 ASSIGNMENT OF ERROR NUMBER 8
Defendant contends that the trial court erred in refusing to give his requested special jury charge number 3. He argues that, without this charge, the jury was unable to understand the relationship between the crimes of simple battery and second degree battery, and how those offenses are related to the crime of manslaughter.
A review of the record shows that defendant merely objected to the trial court's refusal to give this charge, but failed to state any grounds for his objection as required by LSA-C.Cr.P. Article 841. The defendant is required to state the basis of his objection to the trial court so that the trial court will have an opportunity to rule on the objection and to avoid or cure any error. State v. Baylis, 388 So.2d 713 (La. 1980); State v. Lewis, supra.
Thus, we will give no further consideration to this assignment of error.

ASSIGNMENT OF ERROR NUMBER 9
Defendant contends that the trial court committed reversible error in refusing to allow into evidence a copy of the autopsy report on the victim prepared by Dr. Freeman. In support of his contention, defendant cites State v. Andrews, 369 So.2d 1049 (La.1979), and LSA-C.Cr.P. Article 105. We find Andrews to be inapposite.
Initially, we observe that defendant wanted the autopsy report in evidence, "not so much to show it to the jury, but to have something for [his] forensic pathologist to refer to".
However, defendant's expert did have prior access to the report and was aware of all its contents. LSA-C.Cr.P. Article 105 does not create the right for either party to have a complex medical report submitted to the jury. It merely declares such evidence to be competent. In State v. Winzer, 354 So.2d 533 (La.1978), and in State v. Vincent, 338 So.2d 1376 (La.1976), the Louisiana Supreme Court recognized the primary purpose of LSA-C.Cr.P. Article 105 to be the providing of the flow of information needed by the district attorney's office in apparent homicide cases.
The trial court's determination of admissibility and relevance are not to be disturbed in the absence of a clear showing that he has abused his wide discretion. State v. West, 419 So.2d 868 (La.1982). In refusing to allow the jury to attempt to decipher the medically prepared report, the trial court did not abuse its great discretion. Through the intensive testimonies of both Dr. Freeman and Dr. McQuown[4], the jury was thoroughly informed as to the contents of the autopsy report.
There is no merit to this assignment of error.

DECREE
For the reasons assigned, defendant's conviction is affirmed.
AFFIRMED.
DOMENGEAUX, J., concurs and assigns reasons.
DOMENGEAUX, Judge, concurring.
I agree completely with the majority opinion, but in keeping with my position on the review of facts doctrine I reiterate the views stated in my previous concurring opinion in State v. Gatson, 434 So.2d 1315 (La.App. 3rd Cir.1983). I feel that the continued application of the review of facts rationale set out in Jackson v. Virginia, supra, and State v. Mathews, 375 So.2d 1165 (La.1979), results in our appellate courts *240 becoming nothing more than second guessers of the triers of fact.
NOTES
[1] Defendant testified that one Dalton Williams came by his house the next morning, and that Williams ... "told her hello". However, the victim just looked at him and turned her head back. Curiously, neither the State nor the defendant called Williams as a witness at the trial of this matter.
[2] Defendant raised the issue of the sufficiency of the evidence used to convict him by means of a motion for a new trial, and a motion for a post-verdict judgment of acquittal. Both motions were denied by the trial court. Because of our decision herein, we agree with the trial court's denial of these two motions.
[3] In his closing argument to the jury, the prosecutor stated that certain evidence had been presented to show that defendant intended to inflict great bodily harm on the victim when he beat her. Apparently, the State believed that it could not (and had not) proven that defendant had the specific intent to kill the victim.
[4] Dr. Albert L. McQuown was accepted by the trial court as an expert in the fields of anatomical and clinical forensic pathology. Essentially, Dr. McQuown was of the opinion that the autopsy performed on the victim was incomplete because the skull had not been opened and the brain had not been examined. He disagreed with Dr. Freeman's opinion that the victim had been strangled, although he admitted that it was possible that she had been killed in this manner. However, he stated that it was impossible for him to determine the cause of death because of the incomplete autopsy.

It is apparent that the jury accepted the opinion of Dr. Freeman and rejected that of Dr. McQuown. We can find no basis for upsetting this determination.