980 So.2d 716 (2008)
STATE of Louisiana
v.
Bryan S. MATHIEU.
No. 2007-KA-0204.
Court of Appeal of Louisiana, Fourth Circuit.
February 27, 2008.
*717 Eddie J. Jordan, Jr., District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE).
TERRI F. LOVE, Judge.
The State filed a bill of information, charging the defendant-appellant with first degree murder in violation of La. R.S. 14:30 on May 15, 2003. The defendant was arraigned and pled not guilty. A twelve-person jury found the defendant guilty as charged. The jury was deadlocked as to the penalty to be imposed. The court later sentenced the defendant to *718 life imprisonment without benefit of parole, probation, or suspension of sentence. At that time, the court granted the defendant an appeal.
We find the State presented sufficient evidence for the jury to find that the defendant committed the first degree murder of James Robinson. We hold that the trial court did not err by allowing the State to introduce the evidence of the prior incident, the letter and the recording of the telephone calls and affirm the defendant's conviction and sentence.

PROCEDURAL HISTORY
On May 15, 2003, Mr. Brian Mathieu ("Mathieu") was indicted for the first degree murder of Mr. James Robinson ("Mr. Robinson"). At his arraignment on May 22, 2003, he pled not guilty. Mathieu filed a motion to quash that the court denied on August 29th. This Court denied the defendant's writ on this issue. State v. Mathieu, unpub. XXXX-XXXX (La.App. 4 Cir. 11/12/03). On May 6, 2005, the trial court granted the State's motion to introduce evidence of other crimes. On July 20, 2005, a twelve-person jury found Mathieu guilty as charged. The next day the jury deadlocked as to the penalty to be imposed. The court reset the matter for sentencing, but Hurricane Katrina intervened. The matter was reset several times thereafter, and on September 5, 2006, the court sentenced Mathieu to life imprisonment without benefit of parole, probation, or suspension of sentence. On the same date, the court granted Mathieu an appeal.
The record was lodged in this Court on and supplementation of the record was completed. Counsel for Mathieu filed a brief on his behalf and the State responded. Pursuant to Mathieu's request, this Court sent him the record and granted him time to file a pro se brief. He failed to do so.

FACTS
On March 24, 2003, police officers received more than one call concerning a shooting in the 1300 block of Frenchmen Street. When they arrived, they found the body of Mr. Robinson lying half-way out of the front-seat passenger door of a car. They also discovered Robinson's sister, Keisha Robinson (hereinafter "Keisha"), who had also sustained gunshot wounds. Keisha was taken to the hospital. Crime lab personnel collected seven spent casings from the scene. Of these casings, one was found on the ground in front of the car, another was found on the windshield of the car, another was found on the driver's seat, and a fourth was found on the front passenger floorboard.
The following testimony was adduced at the trial on this matter.

Testimony of Dr. Gerald Liuzza
Dr. Gerald Liuzza, qualified as an expert in forensic pathology, testified that he performed the autopsy on Mr. Robinson and recovered four bullets from his body. He detailed Mr. Robinson's gunshot wounds, including one to the front right side of Mr. Robinson's chest, one to the rear portion of his head, one to the front upper portion of his arm, one to the left buttock, and one to the backs of his thighs. Dr. Liuzza testified that the bullets were fired from the victim's left side, and the lack of gunpowder residue showed that they were not fired from a close range. He testified that the head wound, which severed Mr. Robinson's spinal cord, was the fatal wound. He also testified that he took fluid samples from Mr. Robinson that showed no presence of alcohol or drugs, but he found a baggie of twenty-one individually-wrapped pieces of crack cocaine *719 secreted in between Mr. Robinson's buttocks.

Testimony of Officer Kenneth Leary
Off. Kenneth Leary, qualified as an expert in firearms identification, testified that the seven cartridges seized from the scene were all fired from the same gun. He stated that the bullets recovered from Mr. Robinson's body were also fired from the same gun, but because he did not have a gun for comparison, he could not tell if the same gun that fired the cartridges also fired the bullets taken from Mr. Robinson's body. Off. Leary stated that he did not test the cartridges for fingerprints, but it was more than likely that any prints would have burned off of the cartridges when they were fired.

Testimony of Leroy Robinson
Leroy Robinson ("Leroy"), who was twelve-years-old at the time of trial, testified that he is Keisha's son and Mr. Robinson's nephew. He testified that he was nine years old at the time of the shooting, and he was riding in the back seat of the car when the shooting occurred. He testified that his uncle was driving and his mother was sitting in the front passenger seat when someone called to Mr. Robinson while they were driving on Frenchmen Street. Leroy testified that Mr. Robinson told the man he would be right back, and he turned the corner. Leroy testified that the street was blocked, and his uncle backed the car onto Frenchmen. At that point, a man whom Leroy had never seen before ran up to the car and began shooting. Leroy identified the shooter as Mathieu. Leroy stated that he heard seven or eight shots, and then the shooter began to run away. Leroy stated that he chased the man down the street and saw him stick his hand into a trash can and then keep running. Leroy testified that he chased the man until the man jumped a fence behind which was a dog. Leroy returned to the car and saw his uncle lying with his head in his (Leroy's) mother's lap. He testified that at this point he learned that his mother had been shot in the stomach and thigh. A co-worker of his grandmother appeared on the scene and took charge of him. Leroy testified that he went to the police station and then returned with officers to the scene two to four hours after the shooting, but they were unable to find any weapon in the trash cans.
Leroy testified that a few days later he returned to the police station with his grandmother and viewed a photographic lineup from which he chose Mathieu's picture as the person who shot his uncle and his mother. Leroy insisted that Mathieu was the same man who stood next to the driver's door and shot his uncle and his mother. Leroy testified that his mother survived the shooting. However, she was murdered approximately two months later when they were leaving the courthouse after testifying before the grand jury.
On cross-examination, Leroy testified that he never told the police that his mother was driving the car when she and his uncle were shot. He testified that he did not know who the man was who yelled to his uncle just prior to the shooting, but his uncle called the man Darryl. Leroy stated that he saw the defendant put his hand inside the car and shoot. He testified that he did not know his mother had been shot when he chased the defendant, but he discovered this when he returned to the car.

Testimony of Ashley Robinson
Ashley Robinson ("Ms. Robinson") identified herself as Keisha and Mr. Robinson's sister. She testified that in July 2002 she was riding with her sister on Frenchmen Street when they were stopped by a car parked in the middle of the road. She testified that Keisha waited awhile and then blew the horn. In response, the man *720 at the stopped car, whom she identified as Mathieu, yelled back at Keisha, "B____, wait." Ms. Robinson testified that Keisha yelled back to Mathieu, and then the car left. Ms. Robinson stated that she and Keisha drove about a block before parking; then Keisha got out and continued the argument with Mathieu. At that point, he punched her in the jaw, and she fell to the ground. Ms. Robinson testified that she then physically fought Mathieu until another person broke up the fight, and Mathieu fled. Ms. Robinson testified that Keisha's jaw was broken in the fight. Ms. Robinson testified that although she did not know Mathieu prior to the fight, he had gone to the same middle school as she had, and she knew him only as "Bryan."
On cross-examination, Ms. Robinson testified that she never spoke to the police about this incident, but Keisha made a police report at the hospital. She testified that Keisha did not report the fight on the day it happened.

Testimony of Officer Gregory Clay
Off. Gregory Clay testified that on July 10, 2002, he went to a local hospital to take a report regarding a battery involving Keisha. He testified that Keisha was in distress and had a swollen jaw when he spoke with her. He stated that the battery did not occur on the day that he interviewed her. He testified that Keisha could only identify her attacker as "Bryan." Off. Clay stated that he did not interview Ms. Robinson.

Testimony of Detective John Hunter
Det. John Hunter testified that when he arrived on the scene of the murder, Keisha had already been taken to the hospital. Det. Hunter testified that Mr. Robinson's body was hanging out of the passenger side of the car, and most of the blood inside the car was on the passenger seat. He testified that he thought that Mr. Robinson was the passenger in the car, and there was no indication that Mr. Robinson had been moved. He stated that he did not see Leroy on the scene at that time. Det. Hunter stated that later he obtained an arrest warrant for Mathieu, but Mathieu surrendered to the police.

Testimony of Detective Calvin Brazley
Det. Calvin Brazley testified that he was lead investigator of the murder. He testified that when he arrived on the scene, he saw James Robinson's body lying half-way out of the passenger door of the car. At that time, Keisha Robinson had been taken to the hospital, and Leroy Robinson had been taken to the police station. He testified that he ordered the crime lab personnel to process the scene, and he had Leroy returned to the scene. He testified that he and Leroy walked the route the shooter took and looked inside garbage cans along the way, but they found no weapons. Det. Brazley testified that he visited Keisha in the hospital and showed her a lineup.
Det. Brazley testified that he obtained Mathieu's name as a suspect, and a few days after the shooting he showed Leroy a lineup that contained Mathieu's picture. He testified that Leroy identified Mathieu from the lineup as the man who shot his uncle and his mother. He stated that Leroy's grandmother, who was not a witness to the shooting, was present when Leroy made the identification. Det. Brazley insisted he did not indicate to Leroy which photograph to choose. Det. Brazley testified that some time later, he testified before the grand jury, as did Leroy and Keisha. He stated that Keisha was shot and killed on the way home from the courthouse.
Det. Brazley testified that personnel from the criminal sheriff's office contacted him concerning a tape of telephone calls between Mathieu and his family. He then obtained a warrant to search Mathieu's *721 cell, and deputies seized a four-page letter written by Mathieu to someone named "Sparkle." He testified that Mathieu's mother voluntarily came to the police station and identified the speakers on the tape of the telephone calls as Mathieu's mother, his brother Don, and his friend Kenel Scheckenburg. Det. Brazley testified that Don Mathieu and Scheckenburg were then arrested for conspiracy to commit the murder of a witness.
On cross-examination, Det. Brazley testified that Mathieu's mother identified the handwriting on the letter as being that of Mathieu. He stated that he showed her the letter and had her listen to the taped calls when she was at the police station, but he did not remember how long she remained at the station. He stated that he informed Ms. Mathieu of her rights while at the police station because she could have been charged in the future as an accessory, but he insisted that she voluntarily accompanied him to the police station, and she was not under arrest while she was there. Det. Brazley testified that Ms. Mathieu gave a statement prior to leaving the station, but he denied that he told her she must make a statement before she could leave. The State produced the waiver of rights form that she signed prior to making her statement, and the form indicated that Det. Brazley was investigating the murder, not that she was a suspect.

Testimony of Donald Hancock
Donald Hancock testified that he was the telephone supervisor for the Orleans Parish Prison, and he maintained the recording equipment used by the prison and monitored prisoner's calls. He testified that in August 2004, he was investigating another inmate on Mathieu's tier and had blocked that inmate's calls. He testified that he suspected that the inmate was using other inmates' folder numbers to make intimidating calls to his ex-wife, and he started monitoring the calls of all of the inmates on the tier. He testified that he heard something on Mathieu's calls that was suspicious, and he gave the Internal Affairs Division a copy of the suspicious calls. That department then contacted the Special Investigation Division ("S.I.D.") of the sheriff's office. Hancock testified that he monitored Mathieu's calls until August 31, 2004, and made copies of the calls. He identified two CDs of telephone calls involving Mathieu, and these CDs were played to the jury.
Capt. Michael Laughlin of S.I.D. testified that he received the tapes of the telephone calls Hancock recorded and gave them to the district attorney's office. He testified that he had Hancock continue to monitor Mathieu's calls, and he also contacted the prison's mail room to monitor Mathieu's mail, but nothing suspicious was found in the mail. He testified that Mathieu was lodged in an open tier with twenty-six other inmates, and there were no locks on the inmate's lockers. Capt. Laughlin testified that he and his deputies went to the tier and had Mathieu point out which bed was his. They had Mathieu take out his possessions and place them in a bag, and then they took Mathieu to an office, where they inventoried the bag in Mathieu's presence. One of the items they seized was a four-page letter addressed to "Sparkle" from "Bryan." Capt. Laughlin then contacted Det. Brazley.
On cross-examination, Capt. Laughlin testified that he did not know whether Mathieu printed all his correspondence or if he could write in script, but Mathieu admitted the letter was his when it was seized from his cell. Capt. Laughlin testified that the letter contained no date or signature, but the name "Bryan" is at the beginning of the letter. He testified that Det. Brazley took all of the paperwork seized from Mathieu, and he returned all *722 of it but the letter. Capt. Laughlin did not remember if any of the paperwork contained any script or only printing. Capt. Laughlin testified that both the CDs of the telephone calls and the letter referred to Mathieu's daughter. He stated that all inmates are warned that their telephone calls could be monitored and generally only incoming mail is searched unless there is a request to search outgoing mail. He stated that Mathieu sent no letters during the time they were monitoring his mail.
The State presented the letter to the jury. The letter was addressed to Sparkle from Bryan. In the letter, the writer stated that he was stressed after Sparkle's visit. The following was written: "the only f____ed up thing about the situation is everybody ain't die. And I didn't follow my first mind and kill my witness myself I trusted my brother and he f____ed over me." The writer stated that he would get out of jail, even if he had to run out of the courtroom. In the letter, he mentioned their daughter Sun'Shyne and also mentioned that he knew Sparkle was seeing another man, who he indicated was sending drugs to the prison every week and who he was going to kill. He stated that Sparkle should get a job to support herself, rather than living with that man, or he would kill her, too. He indicated that the State had only so long to try him before he would be released, and he stated: "But if I get lil one killed I'll come home in a few days that why I'm trying to get him killed." The writer mentioned Sparkle's intention to join the army and spoke of their life together after she got out of basic training. The writer then stated: "If I was to get the witness killed and you still in . . . training I'm a get [illegible] and leave till you come get us. Cause like I said if the lil boy die I'll be home in about two or three days that why I'm trying so hard to do it." The letter did not contain a signature.

Testimony of Darryl Lewis
The defense called Darryl Lewis ("Mr. Lewis"), who admitted that he was incarcerated at the time of trial on drug charges. He identified himself as the man who Mr. Robinson stopped to talk to on the day of the shooting. Mr. Lewis testified that he was standing in the middle of the block on Frenchmen when he was haled by Mr. Robinson, who was in a car driven by his sister. Mr. Lewis stated that he did not see anyone else in the car at the time. Mr. Lewis testified that Mr. Robinson called to him and asked him who in the area had "weed," and he pointed to some men in a nearby car. Mr. Lewis testified that one of these men went to Mr. Robinson's car and then ran into a nearby house, and Mr. Robinson's car pulled to the corner to wait. Mr. Lewis testified that a few minutes later, he heard shots, and he ducked down behind a car. He stated that he saw a tall man fleeing from Mr. Robinson's car. Mr. Lewis estimated that the man was approximately 6'5" tall, and he insisted that the man was not Mathieu. Mr. Lewis testified that he knew Mathieu because his cousin was Mathieu's girlfriend. Mr. Lewis admitted he did not speak to the police about the murder.
On cross-examination, Mr. Lewis stated that he had been on the scene about five hours that day, but he could not remember who his companions were on that date. He insisted he did not see Mathieu on the scene that day. He identified the man who went to Mr. Robinson's car as Cardell Jackson, but he stated that Jackson was not the man who shot Mr. Robinson. He stated that the shooter was too tall to be Mathieu. He also testified that he saw no one running after the shooter.
*723 Wilhelmina Mathieu ("Ms. Mathieu") testified that she is Bryan Mathieu's mother. She testified that she was asleep when police officers came to her house, demanding to see her. She testified that when she saw Det. Brazley in the house, she thought the police visit must have had something to do with her son Bryan. She testified that Det. Brazley told her they were looking for any letters or papers from Bryan, and she replied that the items in the house belonged only to her or her cousin. Nonetheless, the officers searched the house and came back downstairs carrying some papers. Ms. Mathieu testified that the officers told her that they had heard her voice on a telephone call with Bryan and her son Donald wherein the number "30" was mentioned, and she testified that they told her this referred to a murder. She stated that the officers told her that she was a suspect in a conspiracy to commit murder. She stated that she went to the police station, where she remained from around 1:00 p.m. until 10:00 p.m. She denied that anyone told her she was free to leave. She testified that while she was there, she was shown only the first page of a letter, and she denied that she identified the handwriting as Bryan's. She testified that the letter was in script, and she insisted that Bryan only printed. Ms. Mathieu denied discussing with her son killing a witness. She insisted that the police threatened her that something would happen to her and that she would get forty years if she did not respond to their questions. She testified that the police only recorded her last statement.
On cross-examination, Ms. Mathieu admitted that she was advised that she was suspect. She insisted that the letter was not in her son's handwriting, and when presented at trial with a pro se motion written by her son, she indicated that the motion contained her son's signature, but the handwriting on the motion was not his. She identified Sparkle as her son's baby's mother and Sun'Shyne as her son's small daughter. She maintained that her phone calls with her son were innocent, and she insisted that any reference in them to "30" was a reference to her daughter who was turning thirty. After the State played a tape of her statement, Ms. Mathieu testified that the police forced her to make the statement. She testified that she told Det. Brazley that her son wanted her to speak with the victim's family to tell them that he did not commit the murder. The State then played a portion of the statement in which Ms. Mathieu stated that he told her to ask the victim's family for forgiveness. On redirect, Ms. Mathieu insisted that she asked for an attorney before she left her house, but the officers would not let her use the telephone. She also testified that the police refused to let her talk to her brother, who is a pastor.
Mathieu testified that he had prior convictions for illegal possession of stolen property and unauthorized use of a motor vehicle, as well as a juvenile adjudication. He denied knowing the Robinsons and denied killing Mr. Robinson or trying to kill Keisha or breaking her jaw. He testified that he was not present when Mr. Robinson was murdered, and he stated that he was 5'8" tall. Mathieu denied writing the letter introduced at trial. He acknowledged that the voice on the recording of the telephone calls was his, but he insisted that his conversation did not pertain to killing anyone. He stated that his telephone conversations dealt with his desire to go to trial so that he could be released from prison, and they expressed his frustrations at having to go court repeatedly. Mathieu denied seeing anyone recover the letter from his possessions at prison, and he denied any knowledge of the letter. He testified that there were twenty-one inmates on his tier, and he had talked extensively *724 to the other inmates about his daughter and her mother. He stated that because Sparkle had no plan to join the army, he would not have mentioned it in a letter. He insisted that he seldom sent letters to his family, and he never threatened anyone in a letter. He insisted that he only prints when he writes, and the only thing he writes in script is his signature. He stated that he knew his calls in jail would be monitored and that his mail would be read.
During cross-examination, Mathieu testified that his signature on the pro se pleading introduced at trial was dissimilar to the "Bryan" written in the letter. The State had him write his name and his daughter's name, as well as the first line of the letter, and these exhibits were shown to the jury. Mathieu insisted that he did not know how the sheriff's deputy obtained the letter. He testified that his tier-mates knew how he spelled his daughter's name, and he denied knowing who would have written the letter, as he had no enemies on the tier. He denied discussing his case with any of the other inmates on the tier. He also denied knowing Ms. Robinson from middle school.
The State again played the recording of the telephone conversations, and Mathieu identified the people on the tape as himself, his mother, and his brother Don. He testified that he did not remember what he meant when he said, "You didn't see nothing." He denied that either his mother, his brother, or his friend, Kenel, would arrange to have a witness killed. He insisted that the "30" mentioned in the conversation referred to an offer from the State to give him thirty years if he pled guilty. He insisted that someone from the State made him this offer, but he did not have an attorney at the time the offer was made. He denied knowing "30" could refer to murder.

Testimony of Sparkle Lewis
Sparkle Lewis ("Ms. Lewis"), the mother of Mathieu's daughter, testified that she sent Mathieu photographs of their daughter and letters while he was in jail. She denied ever having a plan to enlist in the army. When she was shown the letter, she testified that she did not recognize the handwriting as being that of Mathieu. She insisted that Mathieu always printed when he wrote anything. She acknowledged knowing Darryl Lewis, but she denied asking him to testify for Mathieu.
On cross-examination, Ms. Lewis insisted that the letter was not in Mathieu's handwriting, but she recognized his signature on the pro se motion and the writing samples taken in court. She stated that she and Mathieu had become estranged by the time of trial, and she admitted she had recently had another baby. She testified that although she did not tell Mathieu that she had a new boyfriend, she was pregnant when she visited him in jail. She testified that she and Mathieu corresponded frequently while he was in jail until they broke up, after which she received no letters from him. She denied knowing who killed Mr. Robinson.
On rebuttal, the State presented Det. Mitch Weatherly, who testified that he was present when Wilhelmina Mathieu gave her statement to the police. He testified that she stated that she understood her rights prior to giving her statement, and she was not threatened by him or anyone else. He insisted that she was free to leave at any time during her stay at the police station. On cross-examination, Det. Weatherly stated that he was not present during the entire time Ms. Mathieu was at the station, just when she gave her statement.

ERRORS PATENT
After a review of the record, we find no errors patent.

*725 SUFFICIENCY OF EVIDENCE
Mathieu contends that the State failed to present sufficient evidence to support his conviction. Specifically, he argues that his conviction was based on the eyewitness testimony of a witness who was nine years old at the time of the offense, and his identification was so suspect that the jury could not have found beyond a reasonable doubt that he was the shooter.
When sufficiency is raised as an assignment of error, a reviewing court must determine whether there was sufficient evidence before addressing any other assignments of error. See State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50. The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in State v. Brown, 03-0897 (La.4/12/05), p. 22, 907 So.2d 1, 18:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01)[,] 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
See also State v. Batiste, 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 04-1199 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
In addition, as discussed by this Court in State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639, writ denied, 06-0029 (La.6/2/06), 929 So.2d 1250:
When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781[, 61 L.Ed.2d 560] (1979). State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893; State v. Woodfork, 99-0859 (La. App. 4 Cir. 5/17/00), 764 So.2d 132. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243[, 53 L.Ed.2d 140] (1977):(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. See State v. Brealy, 2000-2758 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116.
Mathieu was charged with and convicted of first degree murder, which is defined in pertinent part by La. R.S. 14:30 A(3) as "the killing of a human being . . . when the offender has a specific intent to kill or inflict great bodily harm on more than one *726 person." In the instant case, Mr. Robinson was shot repeatedly and killed by a gunman who also shot and wounded his sister Keisha while they were sitting in a car. Mathieu does not dispute that these events amounted to first degree murder. Instead, he argues that the evidence did not prove that he was the shooter. He argues that the only person to identify him as the shooter was Leroy, who was nine years old at the time of the offense and who was seated in the back seat of the car when the shooting occurred. Mathieu argues that Leroy's position in the car did not allow him to get a good look at the perpetrator, and his young age and the terrifying nature of the event caused him to make a misidentification.
Considering the five Manson factors, Leroy testified that he not only saw the shooter while he was seated in the back of the car, he also chased the shooter down the block before the shooter jumped a fence. Although he testified that he did not notice the shooter until he heard the first shot, he looked over at that time and saw the shooter, who was standing outside the driver's door, and watched as he stuck his hand inside the car and continued to fire the gun. It is unknown from the transcript if Leroy gave to the police any description of the shooter. Both Det. Brazley and Leroy testified that Leroy positively identified Mathieu when he viewed the photographic lineup containing Mathieu's picture. He viewed the lineup three days after the murder. Leroy positively identified Mathieu both in the lineup and at trial as the man who shot and killed his uncle and wounded his mother. The jury chose to believe these identifications. This Court has repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 00-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. There is nothing in the record before this Court to indicate that the jury's credibility finding is clearly contrary to the evidence.
Likewise, the jury did not abuse its discretion by choosing to believe Leroy's testimony over that of Mathieu, who insisted he was not even at the scene of the murder. In addition, the evidence concerning the prior attack on Keisha, who was in the car at the time of the shooting and was injured, and the letter contemplating the murder of the "lil" witness, bolstered the evidence of Mathieu's guilt. Contrary to Mathieu's assertion, the State presented sufficient evidence for the jury to find that he committed the first degree murder of Mr. Robinson. This assignment has no merit.

EVIDENCE OF OTHER CRIMES
By his remaining assignment, Mathieu contends that the trial court erred by allowing the State to present evidence of other crimes purportedly committed by Mathieu. The "other crimes" evidence consisted of: (1) evidence of an incident that occurred seven months before the murder wherein the State alleged that the appellant and Keisha became involved in an altercation resulting in Keisha's jaw being broken; (2) a letter purportedly sent by the appellant to his girlfriend wherein he indicates that he should have killed the "lil" witness, and that when the witness is killed, he will be released from jail; and (3) recorded telephone conversations between the appellant, his mother, and his brother wherein, the State implied, a murder was discussed. Mathieu argues that the State failed to establish the admissibility of this evidence.
The State sought to introduce this evidence under La. C.E. art. 404(B)(1), which provides:

*727 Except as provided in Article 412 [not applicable here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to the conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
As per State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, the factor listed in art. 404 B(1) which the State intends to prove through the use of other crimes evidence must either be an element of the crime charged, be at issue in the case, or have some independent relevance to the case. The State must prove by clear and convincing evidence that the defendant committed the other crime. Even if the evidence is relevant, the trial court may exclude it if its probative value is substantially outweighed by prejudicial effect, or if it would confuse the jury or waste the court's time. See La. C.E. art. 403. In addition, the State must meet the requirements set forth in State v. Prieur, 277 So.2d 126 (La.1973) with respect to pretrial written notice of its intent to use this evidence and a detailed description of the prior bad acts. See also State v. Gibson, 99-2827 (La.App. 4 Cir. 4/11/01), 785 So.2d 213. The Supreme Court urged caution in the use of art. 404(B) in State v. Kennedy, 00-1554, p. 5 (La.4/3/01), 803 So.2d 916, 920:
Simply put, the rule articulated in Article 404(B)(1) prohibits the State from introducing evidence of other crimes, wrongs, or acts to show a probability that the accused committed the charged crime because he is a "bad" person who has a propensity for this type of offense. This Court has long recognized that evidence of previous criminal activity does affect, reasonably or not, the opinions of the jurors sitting in judgment. See State v. Moore, 278 So.2d 781, 787 (La.1972) (on rehearing). Therefore, the admissibility of other unrelated misconduct "involves substantial risk of grave prejudice to a defendant." State v. Prieur, 277 So.2d 126, 128 (La.1973) (citing 1 Wigmore, Evidence, S 194 (3rd ed.)).
In State v. Rose, 06-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1243-1244, the Court discussed the balancing test of undue prejudice and probative value:
Although a defendant's prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. State v. Germain, 433 So.2d 110, 118 (La. 1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term `unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a *728 ground different from proof specific to the offense charged.").
In Rose, the defendant was convicted of the strangulation murder of his second wife. At trial the State introduced evidence of the defendant's manslaughter conviction in the stabbing death of his first wife, of his conviction of violent acts against the first wife before her death when they were estranged, and evidence of violent acts committed against the second wife (the victim in the case) while they were separated. Although this Court reversed the defendant's conviction, finding that the acts against the first wife were not similar enough to be admissible in the second degree murder trial involving his second wife, State v. Rose, 05-0396 (La. App. 4 Cir. 1/18/06), 925 So.2d 34, the Supreme Court reversed, finding that this evidence was admissible both to show identity (there were no independent witnesses to the murder) and motive. With respect to the use of other crimes evidence to prove motive, the Court stated: "For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime. State v. Lafleur, 398 So.2d 1074, 1080 (La.1981)." State v. Rose, 06-0402 at p. 15, 949 So.2d at 1244. The Court also quoted from State v. Welch, 615 So.2d 300, 303 (La. 1993): "[T]he state could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the defendant. . . . The primary purpose of the evidence [of prior acts of violence or threats of violence] was not to prove Welch's bad character but to illustrate the volatile nature of his relationship with the victim. . . ." State v. Rose, 06-0402 at p. 15, 949 So.2d at 1245.
In the instant case, there is no argument that the State failed to provide sufficient notice as per Prieur. Indeed, the court held two pretrial hearings on this issue where the State introduced evidence to support its intent to introduced evidence of the altercation between Ms. Robinson and Mathieu, the letter purportedly written by Mathieu, and the telephone calls between Mathieu, his mother, and his brother. At the first hearing, held in conjunction with the Mathieu's pending charge of intimidation of a witness, the State presented evidence concerning the recorded telephone calls between Mathieu and his mother and brother as well as evidence concerning a letter purportedly written by the appellant wherein he stated that the only reason he was still in jail was because neither he nor his brother had killed the "lil" witness. The court subsequently found that evidence of the calls and the letter was admissible to show the identity of the shooter. Donald Hancock of the sheriff's office testified concerning his monitoring of the appellant's telephone calls and his recording of some of these calls. He identified the recordings of five telephone calls made on August 23, 2004, three calls made on August 27, and one call made on August 29. Hancock testified that all inmates are made aware that their telephone conversations could be monitored and taped at any time. Given this testimony, the State presented clear and convincing evidence that the calls were made by Mathieu.
As to the content of the calls, it is not clear exactly what they entailed, because neither the transcript of the hearing nor of trial detailed the calls, nor does the record contain a transcript of the calls. However, a reading of the trial transcript indicates that there was no mention of a "murder" during the calls. Instead, there were references to "30," which the State argued referred to a murder. The defense countered that these references were to the appellant's sister, who was about to turn thirty years old, or to a plea bargain of *729 thirty years. Because of this ambiguity, it would appear that the court could have easily found that the probative value of evidence to show identity outweighed its prejudicial effect. There is nothing to show that the trial court abused its discretion.
With respect to the letter, Det. Brazley testified at the hearing that he got a search warrant for the appellant's jail cell and a second one for his residence. He testified that pursuant to the warrant for the jail cell, he seized a letter purportedly from the appellant to his girlfriend. He testified that he found no letters from the appellant to his brother Don. He testified that he learned about the contents of the letter from a sheriff's deputy, who had found it during a search of Mathieu's belongings on the tier. He admitted that no handwriting exemplars were done to determine if the handwriting was the appellant's, but Mathieu's mother identified the handwriting.
At the hearing, the court held that this letter was also admissible to prove identity, which was an issue in the case. We find the trial court did not err. Although Ms. Mathieu insisted at trial that the letter could not have been written by the appellant because he always printed his correspondence, Det. Brazley testified that at the police station she indicated that the letter was in Mathieu's handwriting. Although there is no transcript of Ms. Mathieu's statement that was played at trial, the State played the statement to impeach her testimony that she told the officers that the letter was not written by Mathieu. Moreover, at trial the jury was shown an exemplar that the appellant gave during his cross-examination for comparison purposes. In addition to the threats contained in the letter, the letter contains details about the appellant's relationship with his girlfriend, Ms. Lewis, and their child, Sun'Shyne. Given these factors, the State proved by clear and convincing evidence that Mathieu wrote the letter. It was admissible to prove Mathieu's identity as the shooter, and its probative value outweighed its prejudicial effect. Thus, the trial court did not err by ruling that it was admissible.
At a hearing, Ms. Robinson testified as to the events in July 2002 wherein her sister Keisha was knocked down by a man Ms. Robinson identified as the appellant. At that hearing, Ms. Robinson testified that Keisha drove up behind a car stopped in the middle of the street. She testified that the appellant was standing outside the car, speaking to the driver. Ms. Robinson testified that her sister blew the horn, and in response he yelled, "B____, we're about to move." Ms. Robinson stated that the car pulled over, and as they drove past, Keisha and the appellant exchanged words. She stated that she and Keisha pulled over a few blocks later to speak with someone, and the appellant came up from behind them and hit Keisha in the jaw. Ms. Robinson testified that Keisha fell to the ground, and Ms. Robinson got out of the car and began fighting with Mathieu. She testified that someone broke up the fight, and Mathieu fled. Ms. Robinson testified that she recognized the appellant because she had gone to the same school as he did, but she only knew him as "Bryan." She testified that after the fight, she took Keisha to the hospital, where they learned that Mathieu had broken Keisha's jaw. Ms. Robinson admitted that she never contacted the police or spoke to them about the incident.
At the conclusion of Ms. Robinson's testimony, the court found her testimony was admissible at trial to prove a motive for the shooting. We do not find that the trial court abused its discretion in finding the testimony admissible. Ms. Robinson positively identified the appellant as the *730 person who hit her sister, Keisha, in the jaw during a fight that erupted over a traffic incident. As such, the State proved by clear and convincing evidence that the appellant was the person who punched Keisha in the jaw and knocked her to the ground. In addition, this incident provided a motive for the shooting that injured Keisha and killed Mr. Robinson. Thus, the trial court did not err by finding that the probative value of this evidence, presented to show identity and motive, outweighed its prejudicial effect. This assignment of error has no merit.
We hold that the trial court did not err by allowing the State to introduce the evidence of the prior incident, the letter and the recording of the telephone calls.

DECREE
Accordingly, the appellant's conviction and sentence are affirmed.