DANIEL L. DYSART, Judge.
| PROCEDURAL BACKGROUND
Defendant, Ronald Anderson was charged by grand jury indictment with two counts of first degree murder of George Roberts and Jonathan Gallagher. The defendant plead not guilty and following a lunacy hearing, the trial court found defendant not competent to proceed to trial. After a second lunacy hearing, defendant was found competent to stand trial. Thereafter the State amended the indictment to charge the defendant with two counts of second degree murder, violations of La. R.S. 14:30.1. The trial court denied defendant’s Motion to Suppress the identifications. The matter proceeded to trial on September 15, 2009 before a twelve (12) person jury. On that same date, this Court granted the State’s writ application relating to the trial court’s ruling denying the State’s Motion in Limine as to the introduction of a mock crime/lineup video.[1] On September 17, 2009, this Court denied the State’s writ as to the admissibility of the substance of a Crimestoppers’ tip.[2]
|2On September 18, 2009, the jury returned separate verdicts of guilty as to each count charged. The trial court denied defendant’s motions for new trial and for post-verdict judgment of acquittal. The defendant was sentenced on each of the two convictions to life imprisonment at *750 hard labor without benefit of parole, probation or suspension of sentence. Defendant subsequently filed this appeal.
FACTUAL BACKGROUND
At trial, New Orleans Police Department Officer David Wright testified that on July 7, 2005, he and his partner responded to a call of a shooting near St. Bernard Avenue and N. Roman Street. Before they arrived at the scene they received a call of another shooting several blocks away, at Laharpe and N. Prieur. They went to the second scene where a large group of on-lookers flagged them down to inform them that a young man was lying in front of 1547 N. Prieur. The officers secured the scene and canvassed the area for witnesses without success.
The victim at the first scene, George Roberts, died of a fatal gunshot wound to the chest. He also had a nonfatal grazing bullet wound to his chin. The victim at the second scene, Jonathan Gallagher, had suffered six gunshot wounds. Four of the bullet wounds were to Gallagher’s head and were fired from within a distance of a foot to a foot and a half away.
New Orleans Police Department Detective Sergeant Troy Williams testified that he was the commander of the NOPD homicide unit on July 7, 2005. The lead detective on the double homicide was Detective Fred Conerly. Sgt. Williams testified that the witnesses described the perpetrators as juvenile males, perhaps fifteen or sixteen-years old. Sgt. Williams testified that he and Detective Conerly viewed outside video surveillance footage from the night of the murders from | ..¡Danny’s Seafood Market, which was located in the area where the shootings took place.
Sgt. Williams also testified about receiving a Crimestoppers’ tip which lead him to a residence in Algiers where the resident, Kerry Gibson, had a digitally recorded message from an individual named Ace Brown. In the message, Brown stated that he had done something bad, but asked Gibson not to call the police. Gibson told police that he believed Brown may have had something to do with the double homicides, and he gave police a description of the car Brown was driving. Sgt. Williams listened to the message but testified that as far as he could recall the message did not mention the murders, and it did not contain a confession.
Detective Fred Conerly testified that he responded first to the St. Bernard Avenue and N. Roman Street homicide scene, arriving there at approximately 9:22 p.m. Conerly noticed that Danny’s Seafood establishment, located at that corner, had a surveillance camera. Detective Conerly spoke with a witness on the scene, Quint-rale Williams, who provided him with a description of the perpetrator of the homicide. Detective Conerly went to the scene of the second shooting where the body of the deceased victim, Jonathan Gallagher, had been removed by the coroner’s office. Julian Gallagher, a second witness, and the brother of Jonathan Gallagher, along with Quintrale Williams, were transported to the First District Police Station to be interviewed. Both men gave statements at the station that were recorded. Each provided a description of the perpetrator. The two audio cassette tapes were logged into evidence at police headquarters. Detective Conerly identified a receipt for those tapes.
Detective Conerly eventually developed defendant Ronald Anderson as a suspect. Anderson lived at 2326 Annette Street which, according to Detective ^Conerly, was within walking distance of the locations of the homicides. He testified that Ace Brown lived in Eastern New Orleans, which was not near the area of the homicides. Detective Conerly conducted photo lineups with the defendant’s photo includ *751 ed. Detective Conerly presented the photo lineups to the witnesses Julian Gallagher and Quintrale Williams separately, at their respective residences. Detective Conerly detailed the identification procedure and stated that Gallagher and Williams picked defendant’s photo out of the lineup, “without hesitation or waiver.” When asked how long it took them to make the identifications, Detective Conerly replied, “I would say immediately.”
Quintrale Williams testified that victim George Roberts was his cousin and that the victim Jonathan Gallagher was his best friend with whom he had grown up. He positively identified the defendant in open court during the trial as the person who murdered George. Williams testified that on the night of the murders, he was at Jonathan and Julian Gallagher’s Republic Street residence when George Roberts telephoned and said he was coming by. Jonathan wanted to go to his girlfriend’s home, so Quintrale, Julian and George Roberts walked with Jonathan from Republic Street to St. Bernard Avenue. As they were walking down St. Bernard Avenue, they observed the defendant and another individual approach and walk behind and alongside them for some period of time allowing both Quintrale and Julian to observe the defendant.
Quintrale testified that he observed the defendant stop at the store, and as the four of them went around the corner next to Danny’s Seafood, defendant and his companion came behind them and asked where they were from. George replied that they were from the Seventh Ward, which is where they were at the time, and defendant asked ‘What side?” George then ran at the defendant to hit him. | ¿Quintrale testified that the defendant sidestepped George, pulled out a gun, and he shot toward George. He further testified that he heard one shot, and that when he ran and turned the corner he heard another shot. He testified that he had seen the video of them walking from the surveillance camera mounted on Danny’s Seafood. The video was played at trial and he identified the defendant and his companion.
Quintrale said that after George was shot he ran towards Claiborne Avenue and the Circle Food Store, where he called 911. He then went to his cousin’s home and after a short period of time returned to the scene and spoke to police officers. Quint-rale said he described defendant to police as approximately five feet seven or eight inches tall. He later estimated defendant’s age that night as sixteen. Quintrale testified he was presented with a photo lineup, and he freely and voluntarily picked out the defendant’s photo as the shooter. He testified that he was able to see clearly who shot George. He further testified that the defendant’s companion that night had a low haircut, and he estimated his age as twelve.
Julian Gallagher was the brother of the victim Jonathan Gallagher. He had known George Roberts since he was seven or eight years old. Julian said the same person who murdered George Roberts murdered his brother Jonathan. Julian’s testimony confirmed that of Quintrale Williams regarding the events that led up to the shootings.
At trial, Julian identified the defendant as the same person who shot George Roberts and his brother Jonathan. After shooting George Roberts, the defendant chased down Julian’s brother Jonathan and shot him. Julian testified that he saw the gun flare in the field where his brother was fleeing and then saw his brother stumbling through the grass. He fled to the First District Police Station where he gave a description of the shooter.
*752 | fiThe prosecutor played the Danny’s Seafood surveillance video, and Julian pointed out the defendant in the video.

ERRORS PATENT

A review of the record reveals no patent errors.
Defendant assigns (5) five errors on appeal which we shall address in the order presented.

ASSIGNMENT OF ERROR NO. 1

In his first assignment of error defendant argues that the evidence was insufficient to support his conviction. Specifically, he argues that the State failed to negate any reasonable probability of mis-identification.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55; State v. Hearold, 603 So.2d 731, 734 (La. 1992).
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988).
The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green, supra. “[A] reviewing |7court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
[[Image here]]
All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay, 2000-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99,106-107.
When the key issue is the defendant’s identity as the perpetrator, the State is required to negate any reasonable probability of misidentifieation. State v. Weary, 2003-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Kelly, 2010-0853, p. 6 (La.App. 4 Cir. 12/12/10), 54 So.3d 1159, 1163. In such a case this Court examines the reliability of an identification using the five factors set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, which include: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the *753 confrontation. State v. Jones, 2010-0018, p. 7 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 832, writ denied, 2010-2683 (La.4/25/11), 62 So.3d 85; State v. Mathieu, 2007-0204, p. 16 (La.App. 4 Cir. 2/27/08), 980 So.2d 716, 725.
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
IsDefendant correctly argues that he was convicted solely on the testimony of witnesses Quintrale Williams and Julian Gallagher. Each witness identified the defendant in separate photo lineups conducted at their respective homes. Each witness was able to immediately select defendant’s picture from the photo lineup. The evidence established that each witness was certain of his respective identification having selected defendant’s photo immediately, without hesitation or waiver. Each witness had an opportunity to view the defendant “close-up” for some period of time. Both testified the area was well lit affording them a clear look at the defendant.
Defendant argues that the time lapse between the murders and the photo lineup was considerable as the murders took place on the night of July 7, 2005, and the photo lineups were not conducted until the morning of July 18, 2005, approximately ten and one-half days later. In State v. Williams, 2010-1197, pp. 11-13 (La.App. 4 Cir. 5/25/11), 66 So.3d 1207,1214-1215, this Court upheld the identifications made by three victims two months and one week after they were robbed at gunpoint by the defendant. In State v. Jones, 2010-1026, p. 2 (La.10/1/10), 48 So.3d 210, 211, the Court held that a two month delay between the lineups was not an unreasonable length of time that would increase the likelihood of misidentification. In State v. Sterling, 96-1390, p. 7 (La.App. 4 Cir. 11/13/96), 684 So.2d 74, 77, this Court found that a three month lapse between the crime and the photographic line-up was not so long as to make the identification unreliable.
Applying the five Manson factors to the facts and circumstances of the instant case, it cannot be said the identifications of defendant by eyewitnesses Quintrale Williams and Julian Gallagher were unreliable.
| ¡Defendant also complains in this assignment of error that police never talked to Ace Brown, who was the subject of the Crimestoppers’ tip, and never showed Ace Brown’s photo to the two witnesses, even though he matched the witnesses’ descriptions of the perpetrator “in certain aspects.” Detective Conerly testified that he fully explored the Crimestop-pers’ tip and concluded it was completely without merit. He noted that Ace Brown was twenty-three years old and that the suspect was described as much younger.
At trial, the defendant, Ronald Anderson introduced a photo of Ace Brown in evidence. Defendant’s lineup photo depicted him as having different features than Ace Brown. The jury reviewed the photo and obviously concluded that the consideration of Ace Brown as a possible suspect did not create sufficient doubt.
Defendant also complains in this assignment of error that police did not determine during their investigation that the defendant had a brother, Ronnie Anderson, who was nine months younger than the defendant and looked very much like him. The police never developed younger brother *754 Ronnie as a suspect or showed his photograph to the witnesses.
Ronnie Anderson testified on behalf of his brother defendant Ronald Anderson. Although Ronnie Anderson only answered a few questions before asserting his Fifth Amendment privilege against self-incrimination, the jury was able to observe him and to determine whether the likeness to his sibling was enough to cast doubt on the witnesses’ identification. Considering that the jury was able to see photos of Ace Brown, and that they were able to witness Ronnie Anderson personally at the trial, it cannot be said that the identifications by Quintrale Williams or Julian Gallagher give rise to a “reasonable probability of misidentification.”
|KIViewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt: (1) that the defendant killed George Roberts and Jonathan Gallagher, having the specific intent to kill or to inflict great bodily harm; and (2) that the State negated any reasonable probability of misidentification.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In his second assignment of error defendant argues that his due process rights were violated when this Court granted the State’s writ application and ordered the trial court to dismiss the first jury venire after the defense showed prospective jurors a forty-second video of a hypothetical/mock crime scene and a hypothetical/mock lineup.
Prior to voir dire, the trial court handled several matters related to the case. Defense counsel sought permission to use a Power Point presentation as part of the defense voir dire. Counsel stated that the only unusual part of the presentation was that in the middle of voir dire he would show a forty-second video of “a hypothetical crime scene and then a hypothetical lineup to give the jury an opportunity to see what it’s like to be an eyewitness.” The State objected citing that it would confuse the jury and plant the seed that eyewitness identifications are unreliable, comparing it to presenting an expert witness to testify that eyewitness identifications are unreliable.
The trial court overruled the State’s objection to defense counsel playing the video during voir dire. The State noted its intent to seek supervisory review in this Court and asked the trial court to stay the trial. The trial court denied the request Infer a stay, and voir dire proceeded. The State sought supervisory review in this Court and a stay. State v. Anderson, un-pub., 2009-1244 (La.App. 4 Cir. 9/14/09).
This Court granted the State’s request for a stay, but not before defense counsel had: (1) advised the entire jury venire that it would be viewing a videotape which consisted of two parts, a video without sound depicting a hypothetical commission of a crime, and an identification procedure; (2) played the first portion of the video, the hypothetical/mock crime, for twenty-three members of the jury venire, with the remaining members of the jury venire out of sight of the video; and (3) thereafter, began, for a moment, to present the second part of the video, which consisted of the hypothetical/mock identification procedure, before learning that this Court had stayed the trial and suspended the playing of the video.
Consequently, the State, in the same-day supplement to its writ application in which it advised this Court of the aforementioned facts, prayed for a new jury venire. This Court granted the State’s writ application and ordered that the jury *755 venire be dismissed and a new jury venire be used.
La.C.Cr.P. art. 419(A) states that a general venire, grand jury venire, or petit jury venire “shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.” However, La.C.Cr.P. art. 787 states that “[t]he court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.” As such, the term “competency” as used in La. C.Cr.P. art. 787 encompasses a venire member or members who has or have been tainted by something occurring during voir dire.
|12La.C.Cr.P. art. 783(A) provides that “[t]he court may excuse a member of the petit jury venire at any time prior to the time he is sworn as a juror to try a particular case.” However, the next sentence of La.C.Cr.P. art. 783(A) provides that, in such a case, “[t]he panel shall be selected from the remaining members of the petit jury venire,” suggesting that the excusal of petit jury venire members under this article only applies to a number less than the entire jury venire. In State v. Wither-spoon, 292 So.2d 499, 503 (La.1974), the Louisiana Supreme Court held that “[i]n the absence of a collusive material injury to the accused” a trial court does not abuse its reasonable discretion “by excusing members of the petit jury venire in advance of the trial,” citing La.C.Cr.P. art. 783, Official Revision Comment (b).
In the instant case, prior to the beginning of the voir dire of the first petit jury venire, the State requested a stay of all proceedings pending this Court’s disposition of its writ application as to the issue of whether defense counsel would be permitted to play the video of a hypothetical/mock crime and hypothetical/mock eyewitness identification procedure for the prospective jurors. The trial court refused to grant the stay, instead, permitting voir dire to begin and allowing defense counsel to announce to the entire venire that he was going to present the video, informing them what the video was about, and then allowing defense counsel to proceed showing the first part of the video to the twenty-three venire members, with the remaining members out of sight of the video. There was no audio in the first part. Defense counsel then proceeded and was showing the second part of the video to those same twenty-three venire members when he learned of this Court’s stay order. As such, upon this Court’s implicit determination that the playing of the video was improper due to its presenting a | ^substantial danger of unfair prejudice, confusion of the issues or misleading the jury, this Court had the authority to fashion a remedy fair to both defendant and the State, that remedy being the dismissal of all members of that first petit jury venire.
The video at issue presented a form of “expert” opinion suggesting, in general, that eyewitnesses’ identifications are unreliable.
The Louisiana Supreme Court has long held that expert testimony on the issue of eyewitness identification is inadmissible— “it is undisputed that the admissibility of expert testimony on eyewitness identification has been uniformly barred by this Court on the occasions the issue has been raised.” State v. Young, 2009-1177, p. 9 (La.4/5/10), 35 So.3d 1042, 1047, cert. denied, Young v. Louisiana, — U.S. -, 131 S.Ct. 597, 178 L.Ed.2d 434 (2010).
The video presented a substantial danger of prejudice to the State by confusing *756 or misleading the jury concerning a dispos-itive factual matter “already within a juror’s common knowledge and experience” — eyewitness identification. See Young, 2009-1177, p. 13, 35 So.3d at 1050. While there was to be no expert testimony discussing anything depicted in the video, both parts of the video depicted mock scenarios, neither having any relation to the instant case.
The trial court clearly abused its discretion in ruling that the two-part video could be played for the jury. This resulted in a substantial percentage of the first voir dire venire being tainted by the video, and thus this Court properly ordered that the venire be dismissed and a new one impaneled. Finally, as to the narrow issue of the dismissal of the first venire and use of the second venire, defendant has failed to show any prejudice resulting therefrom, and thus has failed to show that he was denied any due process rights.
| ^Considering all of the above facts and circumstances, the dismissal of the first petit venire and the calling of the second did not deny the due process rights of the defendant.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3

In his third assignment of error defendant argues that his due process rights were violated when, during voir dire, the trial court failed to grant a mistrial or properly admonish prospective jurors after the prosecutor made a comment, within their hearing, which allegedly implied that defendant had other arrests at a young age.
During voir dire the following colloquy transpired:
MR. CUNNINGHAM (defense counsel):
Mr. Anderson was 16 when he was arrested—
MS. COLLINS:
Objection. Objection, your Honor.
MR. CUNNINGHAM:
The information’s already been disclosed, your Honor.
MS. COLLINS:
And that doesn’t make it proper.
THE COURT:
I cannot rule on the question unless I hear the question completely.
MS. COLLINS:
Your Honor, the first part of his question alone is improper voir dire.
MR. CUNNINGHAM:
You know what, your Honor, I’m going to moot the issue. Go to the next slide.
How many of you agree that a teenager—
MS. COLLINS:
Objection.
LsMR. CUNNINGHAM:
—facing a sentence of life in prison—
MS. COLLINS:
Objection.
MR. CUNNINGHAM:
—should have the right to see—
MR. PHILLIPS:
Judge, can we have—
MR. CUNNINGHAM:
—and introduce the evidence collected by the police.
MR. PHILLIPS:
Can we have a ruling on the objection, Judge? This is improper.
MS. COLLINS:
Objection.
MR. PHILLIPS:
If he can talk about the age he was arrested, let’s talk what he was arrested for at that age then, Judge. That is clearly improper.
*757 MR. CUNNINGHAM:
I’m sorry. What did he just say?
An in-chambers conference immediately followed during which counsel for defendant moved for a mistrial based upon the remarks made by the prosecutor. After a brief conference in chambers, the trial judge denied the motion for the mistrial and admonished the jury to disregard the comment.
Taken in context, the prosecutor’s remark did not refer to any crime as to which evidence was inadmissible. In fact, the comment made by the prosecutor did not refer to any crime alleged to have been committed by the defendant other than the two murders for which he was being tried.
Defendant maintains that a mandatory mistrial was required under La.C.Cr.P. art. 770, or in the alternative cites La. C.Cr.P. art. 771(1) maintaining that |1ñthe trial court should have granted a discretionary mistrial under this provision because the prosecutor’s remark was prejudicial. La.C.Cr.P. art. 771 states:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
[[Image here]]
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
As a general rule, mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667, citing State v. Wilkerson, 403 So.2d 652, 659 (La.1981)(mere possibility of prejudice is not enough to warrant mistrial). In addition, a trial court has broad discretion in determining whether conduct is so prejudicial as to deprive a defendant of a fair trial. Leonard, supra; State v. Sanders, 93-0001, pp. 20-21 (La.11/30/94), 648 So.2d 1272,1288-89.
In the instant case, the prosecutor’s statement was not of such a nature that it might have created prejudice against the defendant in the mind of the jury. Therefore, the trial court properly denied defendant’s motion for mistrial. As for the nature of the admonishment, as none was necessary, the minimal admonishment given by the trial court sufficed.
There is no merit to this assignment of error.
| ^ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error defendant argues that his due process rights were violated by the trial court’s failure to give any jury instructions on the presumption relating to missing evidence, namely, the audiotapes of police interviews of Quintrale Williams and Julian Gallagher, the two eyewitnesses upon whose trial testimony defendant’s convictions were based, as well as the tape recording of Ace Brown’s voice mail message left on Cri-mestoppers’ hotline by tipster Kerry Gibson.
La. R.S. 15:432 provides, in pertinent part:
“A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be *758 destroyed by rebutting evidence; such is the presumption_ that evidence under the control of a party and not produced by him was not produced because it would not have aided him;...
La.C.Cr.P. art. 807, in pertinent part:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury....
* * *
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
Defendant’s written proposed jury charges contained two proposed special instructions relating to the presumption of La. R.S. 15:432. The first, number six (6) in defendant’s list of proposed special instructions, entitled “Adverse Inference,” read:
If evidence material to an issue in this case was peculiarly within the power of the State to produce, was not produced and its absence has not been sufficiently accounted for or explained, then you may, if you deem it appropriate, infer that the evidence would have been unfavorable to the State.
| iSDefense counsel, in arguing for the inclusion of the above special instruction at the charge conference, submitted that the jury was entitled to draw an adverse inference if it determined that the State had failed to come up with an adequate explanation of the State’s failure to preserve evidence. Counsel argued that “[tjhere’s evidence in the record on that, so we would ask for an adverse inference charge.” Defendant also argued that the instruction was proper because the “jury is entitled to draw an adverse inference from the failure to preserve” the evidence that was flooded in the aftermath of Hurricane Katrina. The State argued at trial that the adverse inference instruction was already incorporated into the court’s own instruction stating the State’s burden of proof for the two counts of second degree murder.
The first sentence of defendant’s proposed instruction provided that, “If evidence material to an issue in this case was peculiarly within the power of the State to produce.... ” The use of the phrase “peculiarly within the power of the State to produce” is not the same as the phrasing in La. R.S. 15:432, which refers to “evidence under the control of a party.” Thus, the charge would have required “qualification, limitation or explanation,” and therefore it did not comply with La.C.Cr.P. art. 807. Accordingly, it cannot be said that the trial court erred in refusing to give defendant’s proposed jury instruction number six (6).
Defendant’s second proposed written jury instruction relating to the State’s failure to produce the herein discussed evidence was entitled “Missing Evidence,” and stated:
The State may not rely on Hurricane Katrina or any other explanation for why evidence is missing to diminish its burden of proof. The State has an obligation to prove its case beyond a reasonable doubt and you must conclude that a reasonable doubt exists based on the lack of evidence against 113the defendant if you feel that there has been a lack of evidence. So if you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime because of a lack of evidence, you must find the defendant not guilty even if you conclude that the State could not reasonably recover certain types of *759 evidence or that the State has lost evidence through no fault of its own. La. Code of Crim. Proc. Art. 774.
The State argued that defense counsel could argue about the missing evidence because of Hurricane Katrina all he wanted to, but that did not mean the jury-needed a special instruction. The State argued, as it had with requested special instruction number six (6), that the trial court’s general instruction on the State’s burden of proof would be sufficient. The State was correct, as this matter was included in the general instruction on the State’s burden of proof. Thus, under La. C.Cr.P. art. 807, it did not need to be given. The trial court did not abuse its discretion in declining to give this instruction. Defendant suffered no deprivation of his due process rights by the trial court’s failure to give this instruction and therefore there is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5

In his last assignment of error defendant argues that his constitutional rights were violated by the lack of a unanimous jury verdict. Prior to trial, defendant filed a motion to declare La.C.Cr.P. art. 782(A) unconstitutional because it permits a non-unanimous verdict. In addition to La. C.Cr.P. art. 782(A), La. Const, art. I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.”
Defendant requested the polling of the jury in the instant case, revealing that ten of the twelve jurors voted guilty, while two voted not guilty. Thus, had a [ ^unanimous verdict been required, with this same vote defendant would not have been found guilty.
Defendant concedes that this Court and the Louisiana Supreme Court have rejected the same argument he now makes— that the non-unanimous verdict provided for by La.C.Cr.P. art. 782(A) violates the Fifth, Sixth or Fourteenth Amendments to the U.S. Constitution, citing State v. Bertrand, 2008-2811 (La.3/17/09), 6 So.3d 738, and State v. Barbour, 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, unit denied, 2010-0934 (La.11/19/10), 49 So.3d 396, cert. denied, Barbour v. Louisiana, — U.S. -, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
Both decisions were recently cited and relied upon by this Court in State v. Rubens, 2010-1114 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, when rejecting the same argument defendant makes here.
Accordingly, there is no merit to the fifth assignment of error.
For the foregoing reasons, defendant’s convictions and sentences for the second degree murders of George Roberts and Julian Gallagher are hereby affirmed.
AFFIRMED

. State v. Anderson, unpub., 2009-1260 (La. App. 4 Cir. 9/15/09)(Gorbaty, Kirby, Bel-some — dissenting).

. State v. Anderson, unpub., 2009-1276 (La. App. 4 Cir. 9/17/09)(Kirby, Gorbaty, Bel-some — concurring).